UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGELA D'AREZZO,<br><br>    Plaintiff,<br>-against-<br><br>CATHERINE APPEL and<br>OVERTIME DANCE FOUNDATION, INC.,<br>    Defendants. | Case No. 1:22-cv-00177<br><br><br><br>**Jury Trial Demanded** |

## COMPLAINT

  Plaintiff Angela D'Arezzo, by and through her attorneys, files this Complaint against Defendants Catherine Appel and Overtime Dance Foundation, Inc., and alleges as follows:

### NATURE OF THE ACTION

  1. This is an action brought under federal copyright law, seeking a declaratory judgment that Plaintiff Angela D'Arezzo is the author of a book titled *The Salty Mountain*, which defendant Catherine Appel usurped and falsely registered as her own work, and to recover the proceeds that Appel has wrongfully obtained through her false claim of authorship.

  2. D'Arezzo is a resident of New York City, where her family settled after emigrating from Italy when D'Arezzo was ten years old. *The Salty Mountain* tells the story of D'Arezzo's extended family, their immigration, and their history in Italy.

  3. D'Arezzo met Appel through an organization called the International Center for the Disabled ("ICD"), where Appel was a licensed social worker and psychotherapist and D'Arezzo was a patient. Appel took advantage of the deep bond of trust that D'Arezzo formed with her during the time she was a patient at ICD in order to usurp D'Arezzo's manuscript to *The Salty Mountain*, and to falsely assert that she, rather than D'Arezzo was the work's author.

4. D'Arezzo brings this action to enforce her rights as the true author of *The Salty Mountain,* and to recover from Appel the proceeds that Appel has wrongfully obtained from the promotion and publication of *The Salty Mountain*.

## PARTIES

5. Plaintiff Angela D'Arezzo is the author of *The Salty Mountain*, and is a resident of the County of Manhattan, in the City and State of New York.

6. Defendant Overtime Dance Foundation Inc. is a not-for-profit corporation formed under the laws of the State of New York, with a principal place of business at 350 First Avenue, #3F, New York, NY 10010.

7. Defendant Catherine Appel is, upon information and belief, a resident of the County of Manhattan in the City and State of New York. Appel is a licensed clinical social worker and psychotherapist. At all times relevant Appel was the President and a member of the Board of Directors of Overtime Dance Foundation Inc.

## VENUE & JURISDICTION

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

9. Venue is proper pursuant to 28 U.S.C. § 1391 as a substantial part of the events giving rise to the claim occurred within the judicial district, and one or more defendants reside within the judicial district.

## FACTS

10. *The Salty Mountain* is a book that tells the deeply personal story of D'Arezzo's life, and her family's history in Italy and the United States.

11. D'Arezzo is disabled as a result of Muscular Dystrophy, a progressive genetic disease. D'Arezzo also suffers from a severe anxiety disorder.

12. *The Salty Mountain*'s artistic origins grew from an original theatrical production that D'Arezzo wrote and performed in conjunction with the Visible Theatre's True Story Project, Visible Theater is a nonprofit that stages theatrical productions written and performed by individuals with and without disabilities. Through the True Story Project, D'Arezzo wrote and performed many works in the late 1990's and early 2000's. Among these was an original theater piece titled "The Garden of Gallo Matese" that was inspired by her mother's hometown in Italy, where D'Arezzo lived until the age of 10.

13. In the late 1990's and early 2000's D'Arezzo received medical and psychological treatment through the International Center for the Disabled, or "ICD."

14. Defendant Catherine Appel was employed or affiliated with ICD for nearly the entire period of time when D'Arezzo was a patient there. During this period, Appel provided social work and therapeutic treatment to patients at ICD. The treatments and services that Appel provided to patients at ICD included creative movement therapy sessions in which D'Arezzo was at times a participant.

15. As a member of ICD's staff, Appel had knowledge of and access to information about D'Arezzo's medical and psychological health conditions. D'Arezzo trusted and confided in Appel because Appel was a licensed social worker affiliated with ICD, where D'Arezzo received care. As described below, Appel later abused this bond of trust, and misused her knowledge of D'Arezzo's mental health conditions, in order to take unfair advantage of D'Arezzo.

16. During one of D'Arezzo's visits to ICD for a psychotherapy appointment, Appel approached D'Arezzo and informed her that she had seen a performance of D'Arezzo's "The Garden of Gallo Matese," and that she wanted D'Arezzo to know how much she had enjoyed the piece.

17. D'Arezzo related to Appel that she desired to write a book similarly grounded in the story of her own life and family in Italy. D'Arezzo explained to Appel that she had applied

3

for a grant to fund the book project (with the assistance of a playwright at the Visible Theater), but the grant had been denied and D'Arezzo had been unable to pursue the project. Upon hearing this, Appel offered to assist D'Arezzo with the project.

18. Appel has formal education that D'Arezzo does not, including a Master of Fine Art degree in writing. D'Arezzo had no experience with the publishing industry or as a professional writer, and she believed that Appel would be able to provide mentorship, editorial assistance, and publishing know-how that D'Arezzo lacked.

19. Following this conversation, D'Arezzo began in earnest the process of writing a book based upon her own life and her extended family's history. D'Arezzo began to spend many hours a week speaking with her own parents and family members (in the U.S. and in Italy) to gather the family's stories and history. D'Arezzo wrote of her childhood memories, her parents and grandparents, as well as stories of World War II in Gallo Matese, and vignettes from the history of Italy.

20. During this period of time, Appel and D'Arezzo would meet each Monday at ICD for one hour. Appel billed for each these hourly sessions as a psychotherapy session.

21. Ahead of their weekly sessions at ICD, D'Arezzo would email Appel her writing. During the weekly psychotherapy sessions, Appel would open D'Arezzo's manuscript on the computer, and would use the session to go over D'Arezzo's writing.

22. This process continued for many years, until sometime in or around 2012 when Appel left ICD and took up employment with Sarah Lawrence College.

23. Around the time that Appel left ICD, Appel informed D'Arezzo that her computer at ICD had crashed, and that D'Arezzo's manuscript had been lost as a result.

24. D'Arezzo expressed that she would pay for a technician to attempt to recover the manuscript from the computer, but Appel refused to allow it, stating to do so would be costly, and that instead Appel would find a way to recover the manuscript.

25. Eventually, Appel delivered to D'Arezzo a copy of the manuscript that was in a deplorable state, riddled with misspellings and errors with the use of Italian language words and accent marks.

26. D'Arezzo was deeply upset at the state of the manuscript that Appel returned to her and expressed to Appel her belief that she would need to retype her entire manuscript in order to correct it. Appel Told D'Arezzo that she would not need to retype the entire manuscript, and that instead Appel enlist a student volunteer at Sarah Lawrence College to assist in retyping the manuscript.

27. Appel never delivered on her promise to find a volunteer to re-type the manuscript, and she did not return a corrected copy of D'Arezzo's manuscript as Appel had promised. For months, Appel largely ignored emails and other communications from D'Arezzo. Appel did periodically provide reassurances to D'Arezzo that she would work to make the corrections in the manuscript but never delivered on these promises.

28. In or around 2016, D'Arezzo decided that Appel would never make good on her promise to correct or return the manuscript. She decided to undertake to complete the corrections in the manuscript on her own, without waiting further for Appel to deliver on her promise to help correct the problems in the manuscript. As a courtesy, D'Arezzo informed Appel of this decision, and further informed Appel of her intent to hire a third party to provide editorial assistance to complete the manuscript and ready it for publication.

29. In response to this communication, Appel made statements and took actions that were intended to manipulate D'Arezzo and to dissuade her from publishing her work without Appel's further involvement. Appel discouraged D'Arezzo from making further changes to the manuscript and warned D'Arezzo that working with another editor would dilute D'Arezzo's "voice" in the work. Appel also assured D'Arezzo by email that D'Arezzo had "written enough for a publisher to determine if they are interested" and that once a publisher was located "they will guide your editorial process pre-publication."

30. Appel told D'Arezzo that she would help D'Arezzo to revise the manuscript and prepare it for publication, and that she was already in communication with publishers about the work. Appel told D'Arezzo that she had professional relationships that could be used to help get the book published. Appel again induced D'Arezzo to trust in, and rely upon, Appel's claimed experience and expertise in order to get the book published.

31. Trusting that Appel was working in D'Arezzo's best interests, D'Arezzo began to again work with Appel towards finalizing her manuscript for publication. Throughout the process, Appel was acting in a purely editorial capacity, rather than contributing as an author to a joint work.

32. D'Arezzo offered to compensate Appel for her time and effort in editing the manuscript and navigating the publication process after Appel left her employment with ICD. Appel refused this offer. Appel explained her willingness to assist D'Arezzo by saying that she had received help from members of her community when she was younger, and that she wanted to assist D'Arezzo as a way to give back to the community.

33. It was D'Arezzo's understanding that Appel's continued editorial assistance was being provided out of friendship, mentorship, and in consideration of the longstanding relationship of trust and between the two individuals. At all times D'Arezzo was the sole author of the manuscript.

34. In or around early 2018 D'Arezzo had substantially completed her manuscript. Around this time, Appel and D'Arezzo arranged to meet in person at D'Arezzo's home to discuss matters related to the publication of the manuscript as a book. Also present at this meeting was a lawyer who had been representing D'Arezzo with regard to Medicaid coverage issues.

35. Appel arrived at this meeting with copies of papers that she desired for D'Arezzo to sign. D'Arezzo's attorney read the documents that Appel presented, and encouraged D'Arezzo to consult with an attorney knowledgeable in copyright law before signing any documents.

36. D'Arezzo came to understand that Appel was asserting that she was a co-author of *The Salty Mountain* and was asking D'Arezzo to sign papers acknowledging this fact.

37. D'Arezzo indicated to Appel that she desired to seek legal advice regarding the copyrights and other issues related to the work.

38. In response Appel became hostile towards D'Arezzo. Appel made statements intended to dissuade D'Arezzo from seeking legal advice, and to pressure her into acknowledging Appel as a co-author of the work.

39. Appel told D'Arezzo that D'Arezzo could not publish her manuscript without Appel's involvement and approval. Appel insisted that the work could never be published without Appel's involvement. By email, Appel insisted to D'Arezzo that Appel's own authorship of *The Salty Mountain* was "so evident that it never occurred to me that you would want us to say otherwise."

40. Appel's insistence that she be recognized as a co-author of D'Arezzo's manuscript came as a total surprise to D'Arezzo. Indeed, it represented a 180-degree shift from earlier correspondence, wherein Appel had told D'Arezzo unequivocally that the manuscript was D'Arezzo's work alone, saying "the manuscript and the story are *yours*" and "you do not need a lawyer to protect your work."

41. Appel also insisted that Overtime Dance Foundation, Inc. would control publication of *The Salty Mountain*, and would receive all related revenues.

42. Overtime Dance Foundation Inc. is, upon information and belief, a non-for-profit organization founded and *de facto* controlled by Appel.

43. Appel insisted to D'Arezzo that having "the foundation manage the costs for the book and the funds raised, as well as manage proceeds from the book sales is a good decision. The foundation is tax-exempt and is a safe way to hold the money…." Appel insisted to D'Arezzo that the copyright to *The Salty Mountain* should be registered in the name of Overtime Dance Foundation Inc.

44. Appel told D'Arezzo that having Overtime Dance Foundation Inc. manage the rights to *The Salty Mountain* and receive proceeds from the book would ensure that proceeds from the book would be available for follow-up projects by D'Arezzo, including the publication of a collection of poems written by D'Arezzo.

45. Through her employment at ICD, where D'Arezzo was a patient for many years, Appel was intimately familiar with D'Arezzo's psychological conditions. Appel used this knowledge, as well as her position of trust and authority over D'Arezzo to pressure D'Arezzo into ceding all control over D'Arezzo's manuscript and its publication to Appel.

46. Appel's animosity towards D'Arezzo, and the breakdown in the relationship of trust and confidence she had maintained with Appel exacerbated D'Arezzo's anxiety and stress disorder. So too did Appel's statements casting doubt on the future and publication status of D'Arezzo's book.

47. As a result of the pressure and influence Appel placed upon her, D'Arezzo—under duress and at Appel's insistence—agreed to continue working towards preparation of the manuscript for publication.

48. Appel arranged for a fundraising campaign to raise money to fund the publication of the book. Believing that the money would be used for those purposes, D'Arezzo solicited donations from friends, family, and members of her community. Upon information and belief, this fundraising effort raised around $8,000, all of which was received and retained by Overtime Dance Foundation Inc. Neither Appel not Overtime Dance Foundation Inc. have ever accounted to D'Arezzo for these funds. D'Arezzo never received even a cent of this money.

49. After the fundraiser, Appel stopped communicating with D'Arezzo about the book and its publication, and eventually ceased all communications with her.

50. Without D'Arezzo's knowledge, consent or approval, Appel drafted a forward to *The Salty Mountain* that was included in the published edition of the book. In this forward, Appel falsely claims that Appel authored *The Salty Mountain* based on stories orally recounted by

D'Arezzo. This is patently false. D'Arezzo was, and always understood herself to be, the true author of *The Salty Mountain*.

51. Upon information and belief, Appel and/or Overtime Dance Foundation Inc. has offered copies of *The Salty Mountain* for sale, but have never accounted to D'Arezzo for any share of the revenues of those sales.

52. D'Arezzo has since come to understand that even after insisting that the copyright to *The Salty Mountain* should be owned by Overtime Dance Foundation Inc., Appel instead filed for copyright registration in her own name.

53. Without D'Arezzo's knowledge, consent or approval, Appel filed an application for copyright registration for *The Salty Mountain* with the U.S. Copyright Office. In that application, Appel falsely represented that she was the sole author of *The Salty Mountain*.

54. Relying upon Appel's materially false representations that she was the sole author of *The Salty Mountain*, the U.S. Copyright Office granted registration for that work under the Registration Number TX0008728193 in April of 2019.

## CLAIM I
## DECLARATORY JUDGMENT

55. Plaintiff Angela D'Arezzo repeats and realleges the foregoing paragraphs 1 through 54 as if set forth fully herein.

56. An actual and justiciable controversy exits before this Court with respect to the validity of Defendant Cathy Appel's alleged copyright in *The Salty Mountain*, which is registered as Reg. No. TX0008728193.

57. D'Arezzo is the author of *The Salty Mountain*. Appel was aware of D'Arezzo's authorship of, and ownership interest in, *The Salty Mountain*.

58. In order to obtain a registration in her own name, Appel knowingly and falsely represented that she was the author of The Salty Mountain, and further knowingly and

intentionally failed to apprise the Copyright Office of D'Arezzo's authorship of *The Salty Mountain*.

59. These misrepresentations and omissions made in connection with the application for copyright registration No. TX0008728193 were material to the consideration of Appel's application for copyright registration, and were made with intent to deceive.

60. Accordingly, Plaintiff D'Arezzo seeks a declaration that (a) Angela D'Arezzo is the sole author of *The Salty Mountain*, and that (b) Copyright Registration No. TX0008728193 is invalid.

61. Plaintiff D'Arezzo further seeks a permanent injunction prohibiting Appel from further infringing publication or reproduction of *The Salty Mountain*.

## CLAIM II
## DECLARATORY JUDGMENT
(Pled in the Alternative)

62. Plaintiff Angela D'Arezzo repeats and realleges the foregoing paragraphs 1 through 54 as if set forth fully herein.

63. An actual and justiciable controversy exits before this Court with respect to the validity of Defendant Catherine Appel's alleged copyright in *The Salty Mountain*, which is registered as Registration. No. TX0008728193.

64. In the alternative, Plaintiff D'Arezzo alleges that D'Arezzo and Appel are co-authors of *The Salty Mountain*.

65. Appel was aware of D'Arezzo's co-authorship of, and ownership interest in, *The Salty Mountain.*

66. In order to obtain a registration in her own name, Appel knowingly and intentionally failed to apprise the Copyright Office of D'Arezzo's co-authorship of *The Salty Mountain*.

67. Accordingly, Plaintiff D'Arezzo seeks a declaration that *The Salty Mountain* is a joint work as defined by 17 USC §101, and that D'Arezzo and Appel are co-authors of that work.

68. Plaintiff D'Arezzo further seeks an order compelling Appel to complete and file a Supplementary Copyright Registration identifying Angela D'Arezzo as a joint author of *The Salty Mountain*, using the procedures established by Chapter 1800, Section 1802.8 of the Compendium of U.S. Copyright Office Practices.

## CLAIM III
## COPYRIGHT INFRINGEMENT

69. Plaintiff Angela D'Arezzo repeats and realleges the foregoing paragraphs 1 through 54 as if set forth fully herein.

70. D'Arezzo is the sole author and owner of a creative work, titled *The Salty Mountain*, that is fixed in a tangible medium.

71. Defendants have produced, reproduced, prepared derivative works based upon, sold, distributed, and publicly displayed *The Salty Mountain*.

72. Defendants' infringement has caused and is causing irreparable harm to D'Arezzo for which she has no adequate remedy at law.

73. Unless this Court restrains Defendants from infringing D'Arezzo's protected work, the harm will continue to occur in the future.

## CLAIM IV
## BREACH OF FIDUCIARY DUTY

74. Plaintiff Angela D'Arezzo repeats and realleges the foregoing paragraphs 1 through 54 as if set forth fully herein.

75. A relationship of trust and confidence existed between Appel and D'Arezzo as a result of Appel's employment as a social worker and psychotherapist at the International Center for the Disabled, where D'Arezzo was a patient.

76. Appel induced D'Arezzo to continue trusting and confiding in Appel, and to maintain this relationship, even after Appel ended her employment or affiliation with the International Center for the Disabled.

77. Appel further induced D'Arezzo into a relationship of trust and confidence as a result of Appel's superior knowledge, education, and expertise with respect to book publishing and the preparation of manuscripts for publication.

78. As a result of this relationship of trust and confidence, Appel owed D'Arezzo fiduciary duties of good faith and loyalty.

79. Appel breached these duties as described herein.

80. As a result of Appel's breach of fiduciary duty, D'Arezzo has suffered damages in an amount to be proved at trial.

## CLAIM V
## ACCOUNTING

81. Plaintiff Angela D'Arezzo repeats and realleges the foregoing paragraphs 1 through 54 as if set forth fully herein.

82. To the extent it is determined that D'Arezzo and Appel are co-authors of *The Salty Mountain*, Appel owes a duty to account to D'Arezzo for all income and proceeds generated from the use, sale, production, reproduction, or exploitation of that work.

83. Appel has failed to account to D'Arezzo for any income or revenue generated from her use and exploitation of *The Salty Mountain*.

84. D'Arezzo seeks an order compelling Appel to account for all proceeds related to the exploitation of *The Salty Mountain*, and further compelling Appel to tender to D'Arezzo one half of all such revenue received.

## CLAIM VI
## CONSTRUCTIVE TRUST

85. Plaintiff Angela D'Arezzo repeats and realleges the foregoing paragraphs 1 through 54 as if set forth fully herein.

86. Appel had a fiduciary and/or confidential relationship with D'Arezzo.

87. In breach of fiduciary duties owed to D'Arezzo, Appel diverted monies and property that were due to D'Arezzo.

88. Appel, and/or Overtime Dance Foundation as Appel's designee, were unjustly enriched by the receipt money and property that were due to D'Arezzo.

89. Under the circumstances, Appel and/or Overtime Dance Foundation cannot equitably or in good conscience retain the beneficial interest of such money or property.

90. By reason of the foregoing, D'Arezzo has been damaged, and has no adequate remedy at law.

91. A constructive trust should be imposed on the amounts received by Appel and/or Overtime Dance Foundation from or relating to *The Salty Mountain*, together with interest thereon.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Angela D'Arezzo demands judgement against Defendants Cathy Appel and Overtime Dance Foundation Inc. as follows:

1. An Order
    a. declaring that Angela D'Arezzo is the author of *The Salty Mountain*;
    b. declaring Copyright Registration No. TX0008728193 is invalid; and
    c. enjoining Defendants from all further infringement of *The Salty Mountain*;
   or in the alternative,
    a. declaring that Angela D'Arezzo and Cathy Appel are co-authors of *The Salty Mountain*, and

    b. compelling Appel to file a supplementary copyright registration identifying D'Arezzo as co-author of *The Salty Mountain*, and to bear all costs associated with such filing.

And, in addition, Plaintiff D'Arezzo seeks judgment:

2. Awarding direct and consequential damages in amount to be determined at trial;

3. Compelling Defendants required to provide a full accounting to D'Arezzo for all profits derived from the use of *The Salty Mountain*;

4. Ordering disgorgement of all wrongful profits and proceeds received by Defendants;

5. Awarding reasonable expenses, attorneys' fees and costs;

6. Imposing a constructive trust upon all proceeds derived from the use or sale of *The Salty Mountain*; and

7. Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 7, 2022  
New York, New York

**VENABLE LLP**

By: /s/ John C. Vazquez

John C. Vazquez  
1290 Avenue of the Americas  
New York, NY 10102  
Tel: (212) 307-5500  
jcvazquez@venable.com

*Pro Bono Attorneys for*  
*Plaintiff Angela D'Arezzo*