UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANGELA D'AREZZO

                    Plaintiff,

  - against -

CATHERINE APPEL and OVERTIME
DANCE FOUNDATION, INC.

                    Defendants.

Case No. 1:22-cv-00177

**PLAINTIFF ANGELA D'AREZZO'S RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS AND COUNTERSTATEMENT OF
ADDITIONAL MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Rules for the Southern District of New York, and in

opposition to Fed. R. Civ. P. 56, Plaintiff Angela D'Arezzo, by and through her attorneys,

respectfully submits (i) her response to Defendants Catherine Appel's and Overtime Dance

Foundation, Inc.'s Statement of Material Facts in Support of Motion for Summary Judgment

("Defendants' SOMF"), and (ii) her counterstatement of additional material facts ("Plaintiff's

SOMF"):

**GENERAL RESPONSES AND OBJECTIONS**

Each of the following General Responses and Objections is explicitly incorporated by

reference into each of the Specific Responses and Objections set forth below.

D'Arezzo objects to Defendants' SOMF to the extent that many of the statements do not

comply with Local Civil Rule 56.1(d) which requires that every statement must be supported by

"citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."

In many paragraphs of Defendants' SOMF, the testimonial and/or documentary evidence cited by Defendants in support of an alleged fact does not support the proposition for which it is cited, does not relate to the proposed fact, or contradicts the proposition.

In such cases, D'Arezzo objects to the statement set forth in the paragraph and moves to strike and/or requests that the Court disregard the statement for failing to comply with Local Civil Rule 56(e) and relevant caselaw. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vil. of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015), *aff'd*, NY, 945 F.3d 83 (2d Cir. 2019) ("[W]here the record does not support the assertions in a Local 56.1 statement, those assertions [are] disregarded and the record reviewed independently.") (citations omitted), *aff'd*, *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019).

D'Arezzo further states that her admission of any of the Defendants' statements, or D'Arezzo's failure to object on the grounds of materiality or relevance, should not be deemed as an admission that any such fact is material, relevant, or otherwise admissible at trial, or that there are not additional facts that are needed to place such statement in its proper context. These responses and counter-statements are not intended as an exhaustive statement of all facts that D'Arezzo would adduce if this matter proceeds to trial. Nor are these responses an exhaustive statement of all issues relevant to the case, and D'Arezzo expressly reserves the right to adduce additional facts in any pre-trial order, in other pre-trial submissions, and at trial.

## SPECIFIC RESPONSES AND OBJECTIONS

1.      Ms. Appel is the President and Artistic Director of Overtime Dance. /Affidavit of Catherine Appel ("Appel Aff.") Para. 1.

**<u>Response</u>**:

Undisputed.

2.      Ms. Appel is the sole author and copyright holder of *The Salty Mountain*,

Copyright Reg. Nos. TXu 2-099-480 dated April 22, 2018 and TX 8-728-193 dated April 4,

2019. /Appel Aff. Para. 2; Exhibit "U".

**<u>Response</u>**:

D'Arezzo admits that the Copyright Office issued a copyright registration that lists Appel

as the sole author of *The Salty Mountain*, but asserts that this registration was obtained through a

fraud on the Copyright Office. D'Arezzo disputes that Appel is the sole author of *The Salty*

*Mountain. See* Pl.'s SOMF ¶ 54.

3.      Ms. Appel worked for twenty years at the International Center for the Disabled

("ICD") developing and running the Creative and Movement Arts Program in the Behavioral

Health Department. /Appel Aff. Para. 4.

**<u>Response</u>**:

Undisputed.

4.      Ms. Appel has spent her career working exclusively for non-profit organizations

and/or on non-profit projects including, the American Journal of Dance Therapy, the Research

Journal for the American Dance Therapy Association, and the National Theater Workshop of the

Handicapped. /Appel Aff. Para 4.

**<u>Response</u>**:

Undisputed.

5.      Plaintiff Angela D'Arezzo ("Ms. D'Arezzo") has muscular dystrophy and has availed and avails herself of various non-profit organizations for the benefit of the disabled, including the ICD. /Appel Aff. Para. 5.[1]

**Response**:

D'Arezzo admits that she had muscular dystrophy. D'Arezzo avers that the statement that she "has availed and avails herself of various non-profit organizations for the benefit of the disabled" is argumentative, and not a fact as required under Local Rule 56.1. To the extent a response is required, D'Arezzo does not dispute that she previously received medical and psychological care through the International Center for the Disabled.

6.      In the early 2000s, Ms. D'Arezzo approached Ms. Appel requesting assistance with monologues she was preparing for the Visible Theater True Story Project. /Appel Aff. Para. 7.

**Response**:

Disputed. Appel approached D'Arezzo after seeing one of D'Arezzo's creative performances at ICD. *See* ECF No. 97-15 at 2 (email from D'Arezzo to Gabriella Gafni, including "Cathy called me over at the center to tell me how much she liked my theater monologue[.]"); *see also* D'Arezzo Decl. ¶ 4. After complimenting D'Arezzo for her monologue, the pair engaged in a conversation where D'Arezzo mentioned to Appel that she wanted to write a book about her life, but did not receive the necessary grant money to do so. *See* ECF No. 97-15 at 2 ("I mentioned that I was going to write a book with Stacey, but we didn't get the grant."); *see also* D'Arezzo Decl. ¶ 4. At this point, Appel offered to help write the book together. *See*

---

[1] Defendants' SOMF cites to paragraph 5 of the Appel Affidavit in support of this contention, but the supporting statements are properly found in paragraph 6.

ECF No. 97-15 at 2 ("At that point, she said, I'll do it with you if you want."); *see also* D'Arezzo Decl. ¶ 4. D'Arezzo did not affirmatively seek Appel's assistance. D'Arezzo Decl. ¶ 4.

7.      Before 2005, Ms. D'Arezzo and a playwright from the Visible Theater True Story Project, Stacey Engels, applied for a grant to write a book about Ms. D'Arezzo and her family, but were unable to procure the funding. /Appel Aff. Para 7.

**Response**:

Undisputed.

8.      Between 2005 and 2012, Ms. D'Arezzo would seek Ms. Appel out for help with her monologues, and gradually over time, their work transitioned to compiling material for a book about Ms. D'Arezzo and her family that would eventually become *The Salty Mountain*. /Appel Aff., Para 8.

**Response**:

As noted above, D'Arezzo disputes that she unilaterally sought out Appel's assistance with her writing. *See* Pl.'s SOMF ¶ 48. D'Arezzo avers that the two were always focused on the end product of their work together being a book. *See* D'Arezzo Decl. ¶ 4.

9.      Ms. Appel wrote all the material from 2005 and 2012 on her computer during her writing sessions with Ms. D'Arezzo. /Appel Aff., Para 12.

**Response**:

To the extent Appel is asserting that the only material created between 2005 and 2012 that was incorporated into *The Salty Mountain* was written by her, D'Arezzo disputes this. D'Arezzo wrote portions of *The Salty Mountain* outside of Appel's presence, and brought those materials to the writing sessions with Appel. *See* ECF No. 97-6 at 30:8-31:23; 74:14-19; 75:5-15. Appel's own testimony confirms that D'Arezzo brought pieces of her own writing to their

sessions. *See* Dimon Decl. ¶ 5, Ex. A at 73:16-18. Appel also testified that certain material D'Arezzo brought to their writing sessions made its way into the final manuscript of *The Salty Mountain* for which a copyright was registered. *Id*. at 86:4-19. To the extent Appel is only asserting that when the two worked together in Appel's office, it was Appel who was typing and acting as D'Arezzo's scribe, D'Arezzo does not dispute this.

10.    Excluding any alleged work on *The Salty Mountain* the existence of which is disputed between the parties, it is undisputed that Ms. D'Arezzo has independently authored only three monologues and some poems in her lifetime. / Declaration of Maximilian Travis ("Travis Decl.") Para. 10; [Exhibit "F", Day 1 Deposition of D'Arezzo 27:13-30:4].

**<u>Response</u>**:

Undisputed.

11.    Ms. D'Arezzo does not have a writing process or routine. / Travis Decl. Para. 13; [Exhibit "F", Day 1 Deposition of Ms. D'Arezzo].[2]

**<u>Response</u>**:

D'Arezzo does not dispute that she does not adhere to a formal writing routine. The cited portion of D'Arezzo's deposition testimony does not support the contention that D'Arezzo does not have a writing process. Appel cites a snippet of D'Arezzo's testimony out of context to come to this conclusion. D'Arezzo also testified that she wrote "every week with her parents," *see* ECF No. 97-6 at 76:18-21, "[b]y hand first and then on the computer," *id*. at 77:9-12, and that she often wrote at home after meditating. *Id*. at 77:17-78:3.

---

[2] D'Arezzo notes that Appel cites to the entirety of Exhibit F to the Travis Declaration in support of this contention. D'Arezzo believes the intended citation is to ECF No. 97-6 at 75:6-76:17.

12.     Ms. D'Arezzo has been unable to produce any of the emails from 2005-2012 that she claims she sent to Ms. Appel with work product for *The Salty Mountain*. / Travis Decl. Para. 13; Exhibit "F" Day 1 Deposition of D'Arezzo 71:20-73:9].

**Response**:

D'Arezzo does not dispute that in the course of discovery in this litigation, she was unable to locate the emails from 2005-2012 where she transmitted her work product for *The Salty Mountain* to Appel. However, Appel cites a snippet of D'Arezzo's testimony out of context. D'Arezzo also testified that she does not know what became of these emails, *see* ECF No. 97-6 at 71:25-72:2, she is not good with computers, *id*. at 72:3-5, she searched for these emails, *id*. at 73:5-9, and she is certain that she emailed Appel her written work on a weekly basis. *Id*. at 74:11-19.

13.     Ms. Appel was not a psychotherapist and did not provide psychotherapy services to Ms. D'Arezzo. /Appel Aff., Para 13-14; [Exhibit "F", Day 1 D'Arezzo Deposition Page 38:22 – Page 39:13 and Page 41:9 – 43:12].

**Response**:

D'Arezzo disputes that Appel is not qualified as a psychotherapist. *See* Dimon Decl. ¶ 5, Ex. A at 34:12-22. D'Arezzo avers that Appel held herself out publicly as serving as a psychotherapist as part of her job at ICD. *Id*. at 42:24-43:25. D'Arezzo does not dispute that Appel was not her designated psychotherapist at ICD, but avers that at certain points in time, Appel did provide other forms of therapeutic care to D'Arezzo. *See* ECF No. 97-6 at 42:10-25.

14.     Ms. D'Arezzo's therapist at ICD was Deborah Kelly. /Appel Aff., Para. 13; [Exhibit "F", Day 1 D'Arezzo Deposition Page 38:22-39:13].

**<u>Response</u>**:

D'Arezzo does not dispute that Deborah Kelly was her psychotherapist at ICD. To the

extent that this paragraph implies that D'Arezzo received no other forms of therapy through ICD,

D'Arezzo disputes this contention and avers that Appel did, at certain times, provide creative arts

therapy to D'Arezzo. *See* ECF No. 97-6 at 42:10-25.

15.    Ms. Appel was a clinical coordinator at ICD that ran therapy groups. The sessions

with Ms. D'Arezzo were not private. /Appel Aff., Para. 13.

**<u>Response</u>**:

D'Arezzo does not dispute that Appel was a clinical coordinator at ICD, and avers that

her job title while at ICD was Clinical Coordinator for Creative Arts Psychotherapy Program.

*See* Dimon Decl. ¶ 5, Ex. A at 29:21-30:2. D'Arezzo does not dispute that part of Appel's job

responsibilities included running therapy groups. To the extent that Appel is asserting the writing

sessions with D'Arezzo took place in a group, D'Arezzo disputes this. *See* ECF No. 97-6 at 45:4-

6; *see also* D'Arezzo Decl. ¶ 5.

16.    In 2012, Ms. Appel left the ICD and the writing sessions with Ms. D'Arezzo

came to an end. For the next four years, until late 2016, progress with the book project came to a

halt. /Appel Aff. Para. 18-20; Exhibit "X".

**<u>Response</u>**:

D'Arezzo does not dispute that Appel left ICD in or around 2012. D'Arezzo disputes that

progress with the book project came "to a halt" over the next four years. D'Arezzo avers that the

two still met during this time period, but did so with less frequency. *See* D'Arezzo Decl. ¶ 11,

Ex. 1. D'Arezzo avers that Ex. X to the Appel Affidavit does not support the contention that

work on *The Salty Mountain* came to a halt between 2012-2016, but instead shows a 2015 email

8

exchange regarding edits and revisions to the draft. *See* ECF No. 98-4. D'Arezzo further avers that Exhibits V and W to the Appel Affidavit show 2013 and 2014 email exchanges also related to edits and revisions to the draft. *See* ECF Nos. 98-2 and 98-3.

17.     Between 2012 and 2016, Ms. Appel consistently shared the material from the ICD years with Ms. D'Arezzo upon request. /Appel Aff. Para 19; Exhibit "W"; Exhibit "V".

    **Response**:

    Undisputed.

18.     Between 2012 and 2016, Ms. D'Arezzo would request Ms. Appel make corrections to spelling and Italian accents to the book material, and Ms. Appel would make those corrections. /Appel Aff. 19; Exhibit "V".

    **Response**:

    D'Arezzo does not dispute that between 2012 and 2016, she requested that Appel make corrections to spelling and Italian accents to the book material, and that Appel would make those corrections. D'Arezzo also avers that her contributions were not limited to just the Italian language, but included general editing suggestions. *See*, *e.g.*, ECF No. 98-2 at 3, 6.

19.     Between 2012 and 2016, Ms. Appel attempted to introduce Ms. D'Arezzo to colleagues that could perhaps help her finish her project, including Patricia Dunn, but Ms. D'Arezzo never made these connections. /Appel Aff. 19, Exhibit "W".

    **Response**:

    D'Arezzo disputes that Appel "attempted to introduce D'Arezzo to colleagues." D'Arezzo avers that Exhibit W to the Appel Affidavit only supports the contention that Appel offered to introduce her to Patricia Dunn once in 2013. It does not support the contention that

Appel attempted to make more than one introduction, nor that Appel discussed someone else taking over her role in *The Salty Mountain* with D'Arezzo.

20.    In late 2016, Ms. Appel retired. Out of this development, she found enough time to focus on the book about Ms. D'Arezzo and her family. At that time, the material was comprised of about 44 pages, the same number as in 2012. /Appel Aff. 20, Exhibit "X".

**Response**:

D'Arezzo does not dispute that Appel retired in or around 2016, and that her new schedule allowed the pair to resume more regular and frequent work together on *The Salty Mountain*. D'Arezzo does not dispute the page length of *The Salty Mountain* in 2016 or in 2012, but avers that both D'Arezzo and Appel worked on changes to the manuscript during those four years. *See* ECF Nos. 98-2, 98-3, and 98-4; *see also* D'Arezzo Decl. ¶ 11, Ex. 1.

21.    Ms. Appel organized the material into a cohesive narrative with a point of view and a beginning, middle, and end in late 2016, 2017, and early 2018. That was when the [sic] *The Salty Mountain's* publication version was written. /Appel Aff. 21-23; Exhibit "G", Exhibit "J", Exhibit "T" [sic]

**Response**:

D'Arezzo disputes that it was Appel alone who "organized the material into a cohesive narrative with a point of view and a beginning, middle, and end in late 2016, 2017, and early 2018." D'Arezzo avers that Exhibit J to the Travis Declaration[3] does not support the contention that Appel worked alone, but instead shows collaboration and an invitation for D'Arezzo's input on narrative, flow, and shape. *See* ECF No. 97-10 at 1. D'Arezzo does not dispute that the

---

[3] D'Arezzo notes that Appel cites Exhibit J as offered through the Appel Affidavit, when it is appended to the Travis Declaration.

version of *The Salty Mountain* that was published was finalized in 2018, but avers that nearly 20 years' worth of work and material is contained within the final product. *See*, *e.g.*, ECF No. 98-5 at 1 ("From the earliest days of this project and over many years' time, I was happy to lend my skills, education and experience in the service of shining a spotlight on Gallo and Vairano, so that you and your story could be retrieved and illuminated.")

22.    In late 2016 and 2017, Ms. D'Arezzo broke her leg twice and was confined to bed for a significant period of time. This situation prevented her from writing. /Travis Decl. Para 15; Exhibit "I" Day 2 Deposition of D'Arezzo, 132:17-133:25; 139:15-140:21.

**Response**:

Undisputed.

23.    Also during late 2016 and 2017, Ms. D'Arezzo lacked access to a working computer. Communications between Ms. Appel and Ms. D'Arezzo took place mainly through Claudio D'Arezzo, Ms. D'Arezzo's brother. /Appel Aff. 22; Exhibit "J"; Exhibit "L".

**Response**:

Undisputed.

24.    Although Ms. D'Arezzo literally could not write during the period before publication, late 2016 through early 2018, she claims that Ms. Appel did not write any of the text of *The Salty Mountain* at any point, only the table of contents, foreword, and acknowledgement page. /Appel Aff. Para 23; Travis Decl. Para. 17; Exhibit "M"; Exhibit "K" Day 3 Deposition of D'Arezzo, 191:4-20, 194:5-195:9, 195:22-196:10.

**Response**:

The cited portions of D'Arezzo's testimony do not support the contention that D'Arezzo is claiming "that Ms. Appel did not write any of the text of *The Salty Mountain* at any point, only

the table of contents, foreword, and acknowledgement page." ECF No. 97-11 at 191:4-20 and ECF No. 97-13 concern whether D'Arezzo recalled sending a letter to Appel. The letter does not support that D'Arezzo is claiming "that Ms. Appel did not write any of the text of *The Salty Mountain* at any point, only the table of contents, foreword, and acknowledgement page." ECF No. 97-11 at 194:5-195:9 also does not stand for this proposition, and concerns D'Arezzo's understanding of the word "ghostwriter." Following the cited exchange, Appel's counsel changes his question from covering "making corrections as to spelling or Italian accent [sic] or…something more" to focusing solely on corrections and Italian accents. *See* ECF No. 97-11 at 195:10-196:6. ECF No. 97-11 at 195:22-196:10 similarly does not stand for the proposition that Appel's sole contributions to *The Salty Mountain* were "only the table of contents, foreword, and acknowledgement page."

25.    Ms. Appel is a generous person who has worked all her life in non-profit organizations. Her career has been spent encouraging and supporting people in their artistic endeavors. /Appel Aff. Para. 4 and 25.

**Response**:

D'Arezzo avers that the statement "Ms. Appel is a generous person who has worked all her life in non-profit organizations" is argumentative, and not a fact as required under Local Rule 56.1. To the extent a response is required, D'Arezzo does not dispute that Appel's professional experience includes work in non-profit organizations. D'Arezzo avers that the statement "[Appel's] career has been spent encouraging and supporting people in their artistic endeavors" is argumentative, and not a fact as required under Local Rule 56.1. To the extent a response is required, D'Arezzo does not dispute that Appel has extensive experience collaborating with others on creative projects.

26.    Ms. Appel was generous enough to write *The Salty Mountain* as a gift for Ms.

D'Arezzo and her family. However, Ms. Appel never agreed to allow Ms. D'Arezzo to sell her

work for commercial gain. /Appel Aff. Para. 25-27.

**Response**:

D'Arezzo avers that the statement "Ms. Appel was generous enough to write *The Salty*

*Mountain* as a gift for Ms. D'Arezzo and her family" is argumentative, and not a fact as required

under Local Rule 56.1. To the extent a response is required, D'Arezzo does not dispute that

Appel acted as if her collaboration on *The Salty Mountain* was a gift, and that D'Arezzo believed

the same to be true. *See*, *e.g.*, ECF No. 98-5 at 1 ("From the earliest days of this project and over

many years' time, I was happy to lend my skills, education and experience in the service of

shining a spotlight on Gallo and Vairano, so that you and your story could be retrieved and

illuminated."); *see also* Dimon Decl. ¶ 5, Ex. A at 237:13-238:13. D'Arezzo disputes the

characterization that Appel "never agreed to allow Ms. D'Arezzo to sell her work for

commercial gain" because Appel induced D'Arezzo to believe they both shared a common

understanding that *The Salty Mountain* belonged to D'Arezzo. D'Arezzo Decl. ¶¶ 12-18.

27.    On April 4, 2018, Ms. Appel and Ms. D'Arezzo had an in-person meeting with

Carol Santangelo, Ms. D'Arezzo's attorney from Legal Aid Services. At this meeting, Ms. Appel

learned for the first time that Ms. D'Arezzo wanted sole copyright for *The Salty Mountain* for the

purpose of selling the book, and maybe even the movie rights. Ms. Appel strongly objected to

such plan during the meeting. /Appel Aff. Para 26.

**Response**:

D'Arezzo admits that on April 4, 2018, Appel and D'Arezzo had an in-person meeting

with Carol Santangelo, an attorney from Legal Aid Services. D'Arezzo avers that Santangelo

served as her attorney in a limited scope, and only with respect to certain Medicaid eligibility issues. *See* ECF No. 97-11 at 160:13-15. D'Arezzo disputes Appel's account of the April 4 meeting. D'Arezzo avers that the meeting with Santangelo was set up for the express purpose of discussing potential book proceeds, and that Appel was aware of this. *See* D'Arezzo Decl ¶ 23. D'Arezzo further avers that at this meeting, Appel attempted to secure D'Arezzo's signature on a contract related to ownership of *The Salty Mountain*. *Id*. Santangelo advised D'Arezzo against signing without knowing what it was she was agreeing to, and D'Arezzo did not sign the agreement. *Id*. D'Arezzo further avers that Appel's recollection of this meeting indicates that it was not D'Arezzo who pushed the idea of financial gain, but instead Santangelo encouraged D'Arezzo to fully protect her rights to the book, including for the reason that any money made should go to D'Arezzo. *See* ECF No. 98-5 at 2 ("Ms. Santangelo focused our discussion on potential profit and on protecting your interests.") D'Arezzo further avers that she made a comment about someone else's failed movie deal—if she made one at all—as an exemplar of why she was concerned with protecting her ownership of *The Salty Mountain*. *See* Dimon Decl. ¶ 5, Ex. A at 190:11-25. D'Arezzo disputes that a movie deal related to *The Salty Mountain* was ever discussed. *Id*. at 290:3-14. D'Arezzo disputes that Appel had a strong reaction at their April 4 meeting. *See* D'Arezzo Decl. ¶ 24. D'Arezzo avers that Appel's strong reaction, which D'Arezzo believes was in response to D'Arezzo seeking to protect her legal rights, came in the weeks and months following the April 4 meeting. *See id*. ¶ 25.

28.     As sole author of *The Salty Mountain*, Ms. Appel believed it was her sole prerogative as to whether or not the book could be utilized for commercial gain. Ms. Appel was determined to not allow Ms. D'Arezzo sell her work. /Appel Aff. Para. 27.

**Response**:

D'Arezzo disputes that Appel is sole author of *The Salty Mountain*. *See* D'Arezzo Decl. ¶¶ 12-18. D'Arezzo disputes that Appel conducted herself in such a way that indicated she believed she had sole decision-making authority over the book. D'Arezzo avers that Appel agreed—including in communications that post-dated their April 4, 2018 meeting—that any decisions regarding *The Salty Mountain* were to be made jointly. *See* Pl.'s SOMF ¶ 53. For the avoidance of doubt, D'Arezzo disputes again that *The Salty Mountain* is Appel's work. D'Arezzo does not dispute that Appel was determined to claim *The Salty Mountain* as her own, *see* Dimon Decl. ¶ 5, Ex. A at 198:23-201:2, but avers that Appel's appropriation was wrongful. D'Arezzo further avers that Appel has herself offered printed copies of *The Salty Mountain* for sale through Amazon.com. *See* ECF No. 49 ¶ 33.

29.     On April 15, 2018, Ms. Appel sent Ms. D'Arezzo an email in which she stated that "the actual written text, including the sequencing, shaping and flow of the entire narrative with various artistic structures" was entirely hers and that she would not "give up copyright of my written material to anyone, or entity other than Overtime Dance Foundation, Inc." /Appel Aff. 28; Exhibit "Y", Page 3-4.

**Response**:

D'Arezzo does not dispute that Appel sent her an email on April 15, 2018. D'Arezzo does dispute the accuracy of the first cited quotation and avers that it is taken out of context. The full paragraph correctly reads:

> "The factors to be considered in deciding how to proceed are two-fold: the content of the book for the most part is made up of family stories that are yours. There is also well-researched historical content, but the personal stories and experiences are not mine. The actual written text, however, is from me, including the sequencing, shaping and flow of the entire narrative with various artistic struc-

> tures, such as the title The Salty Mountain. I have always considered writing this material with you as a mutual project we were under- taking for all who might enjoy or benefit emotionally and intellectually from what we were creating."

ECF No. 98-5 at 3. D'Arezzo avers that the second quotation is also taken out of context.

The full paragraph correctly reads:

> "I am perfectly willing to agree to stipulations that the book is not for monetary gain, and that neither of us can make any decision about The Salty Mountain that does not have the consent of the other. Upon reflection and recent developments, I do not agree to free the copyright, or management of the copyright to The Salty Mountain to any entity other than Overtime Dance Foundation, Inc., or to an entity or persons chosen by the foundation to manage the creative, social and academic integrity of The Salty Mountain as in- tended by me, and [as I had previously thought was] intended by you."

*Id*.

30.    On April 27, 2018, Ms. Appel sent Ms. D'Arezzo a letter attached to an email in which she told Ms. D'Arezzo that "You are selling yourself short in trying to take credit for what you didn't do…" and, "As the sole author of the book written in close consultation with you, I have a strong interest in protecting the integrity of the manuscript," and, "The writing itself does not belong to you and [is] [sic] therefore not your legacy," and "I am not taking anything away from you by acknowledging the true nature of the authorship of *The Salty Mountain*…I now realize that we must each take our rightful place in the story of our creative process and the creation of the book *The Salty Mountain*" and, "All of the people who have joined in support of our work on the book project and/or have come to know you through it, also know you are not the sole author, and it doesn't matter to them." /Appel Aff. 29; Exhibit "Z", Page 5-7.

**Response**:

D'Arezzo does not dispute that Appel sent her an email on April 27, 2018, and that the cited excerpts are contained within that longer email.

16

31.    On or about April 30, 2018, Ms. D'Arezzo sought the advice of Tom Papa, a friend of hers, concerning her dispute with Ms. Appel. / Travis Decl. Para. 17, 24, Exhibit "M" and Exhibit "S"; Exhibit "K" Day 3 Deposition of D'Arezzo, 188:23-24.

**Response**:

Undisputed.

32.    On May 4, 2018, Ms. D'Arezzo sent Ms. Appel a letter in which she stated, "I would like to propose that we both take credit for the book and agree to a joint copyright, and a 50/50 share in any proceeds that may come from it – 50 percent can go the foundation or wherever else you decide, and 50 percent can go to my trust." / Travis Decl. Para. 18, Exhibit "N", Page 3, Para. 2.[4]

**Response**:

D'Arezzo does not dispute that she sent Appel a letter by email on May 4, 2018, and that the cited excerpt is contained within that longer letter.

33.    On May 4, 2018, Ms. Appel sent Ms. D'Arezzo an email in which she told Ms. D'Arezzo that "The literary shaping and telling of these stories in *The Salty Mountain* is an exploration and interpretation of these events in a writing that was entirely created by me," and, "as I said in my previous letter, more and more, you became the subject of the project. I did not merely structure the phrases. I wrote every word and worked tirelessly with you to get at what, exactly, the stories were and how to write them clearly," and "As a result of this extra time, further investigation and legal consultation on my part, as well as seeing a side of your intentions

---

[4] D'Arezzo notes that the attachment to the parent email cited in Exhibit N to the Travis Declaration includes written text from both D'Arezzo and Appel, which were sent at different times on May 4, 2018. For the Court's convenience, a true and correct copy of what D'Arezzo believes is intended to be cited in Defs.' SOMF ¶ 32 is found at Exhibit F to the Dimon Declaration.

that had been withheld from me, I now want to adhere fully to the confines of the copyright law, because we did not co-author this book. Yes, it was a collaborative effort, but the actual writing of the work was entirely mine. The only part of the project that can be copyrighted is the text of *The Salty Mountain*, and the text is unmistakably mine. Ideas cannot be copyrighted; and neither can stories. I do not agree to a joint copyright in the book; or that we are co-authors." /Appel. Aff. 30; Exhibit "N", Pages 2-4.

**Response**:

D'Arezzo does not dispute that Appel sent her an email on May 4, 2018, and that the cited excerpts are contained within that longer email.

34.    Ms. D'Arezzo disagreed with Ms. Appel's characterization of how the book was written in Ms. Appel's May 4, 2018 correspondence. Ms. D'Arezzo understood that Ms. Appel was stating that it was Ms. Appel that wrote the book, and Ms. D'Arezzo disagreed with that because she believed she wrote the book and that Ms. Appel had only edited it. /Travis Decl. Para 18; Exhibit "N"; Exhibit "K" Day 3 Deposition of D'Arezzo, 195:22-196:10.

**Response**:

D'Arezzo admits that she disagrees with Appel's characterization that Appel is the sole author of *The Salty Mountain*. Exhibit N to the Travis Declaration does not support the contention that D'Arezzo "believed she wrote the book and that Ms. Appel had only edited it." D'Arezzo wrote to Appel, "in this case, the stories are mine, but you structured the phrases, so, thinking it over, it was a partnership, and I'm proud to have written this book with you." *See* Dimon Decl. ¶ 10, Ex. F. The cited portion of D'Arezzo's testimony similarly does not support the contention that D'Arezzo "believed she wrote the book and that Ms. Appel had only edited it." Appel's counsel asked D'Arezzo her opinion on Appel's role in applying corrections to

words in the Italian language, to which D'Arezzo responded "I'm assuming editing." *See* ECF

No. 97-11 at 195:22-196:6. When Appel's counsel asked if Appel did anything else, D'Arezzo

testified "[s]he wrote the preface and she put the table of contents together and she wrote the

acknowledgment." *Id*. at 196:6-10. Appel's counsel did not inquire further. To the extent that

Appel is alleging D'Arezzo disagreed at a later time with Appel's May 4, 2018 characterization

of how the book was written, Appel does not provide any evidence to support this contention, in

violation of Local Civil Rule 56.1(d).

35.    Ms. D'Arezzo understood that Ms. Appel was claiming that Ms. Appel had

written *The Salty Mountain*, the writing and the text, and that everything belonged to Ms. Appel.

/Travis Decl. Para 18; Exhibit "N"; Exhibit "K" Day 3 Deposition of D'Arezzo, 205:4-9.

**Response**:

D'Arezzo disputes this characterization of her own contemporary understanding of

Appel's communications. At the time, D'Arezzo did not understand a copyright to be

synonymous with authorship, because she had relied upon Appel's advice and instruction that the

two concepts were not the same. *See* D'Arezzo Decl. ¶¶ 28-30. Just one week earlier, on April

27, 2018, Appel told her that copyright is a "construct that has to do with management of, and

monetary gain from, a published work." *See* ECF No. No. 98-6 at 5; *see also* D'Arezzo Decl. ¶

28.

36.    On May 11, 2018, Ms. D'Arezzo sought the advice of Gabriella Gafni, the

Managing Agent of GMG Ghostwriting Services, as to her dispute with Ms. Appel. Ms.

D'Arezzo characterized the dispute as follows, "Cathy wants her foundation to own the book

with all the rights, I'll only be the author without any rights. She is now saying that she doesn't

agree to a joint copyright of the book; or that we are co-authors." /Travis Decl. Para. 19; Exhibit "O"; Exhibit "K", Day 3 of Deposition of D'Arezzo Page 206:22-207:17.

    **<u>Response</u>**:

    D'Arezzo does not dispute that she emailed Gabriella Gafni, the Managing Agent of GMG Ghostwriting Services, on May 11, 2018 about her dispute with Appel. D'Arezzo does not dispute that the cited excerpt is contained within that longer email chain. D'Arezzo avers that, at the time, as a result of her reliance upon Appel's explanation of the meaning and import of the term "copyright," D'Arezzo understood the scope of her dispute with Appel to involve only the rights to the proceeds of the work. D'Arezzo did not understand that Appel was contesting D'Arezzo's creative contribution to the work, and D'Arezzo avers that that her email to Gafni reflects this contemporaneous understanding. *See* D'Arezzo Decl. ¶¶ 28-29; *see also* ECF No.97-15 at 3 ("Cathy wants her foundation to own the book with all the rights, I'll only be the author without any rights.") D'Arezzo further avers that the cited portion of her deposition testimony indicates that at the time, she did not understand Appel's assertions to be clear. *See* ECF No. 97-11 at 207:6-17.

    37.    On May 14, 2018, Ms. D'Arezzo sought the advice of Stacey Engels, a writer, as to her dispute with Ms. Appel. Stacey Engels drafted a proposed response to Ms. Appel, to which Ms. D'Arezzo responded with "I would really like joint copyright," and later "I think your first email covers everything, but I would really like to have joint copyright which she agreed while back, but not now. I doubt she will agree to a joint copyright, and I'm afraid if I push it, she'll get furious." /Travis Decl. Para. 23; Exhibit "R".

**<u>Response</u>**:

D'Arezzo does not dispute that she emailed Stacey Engels on May 14, 2018, regarding her dispute with Appel. D'Arezzo does not dispute that she wrote "I would really like joint copyright." D'Arezzo also does not dispute that she later wrote later "I think your first email covers everything, but I would really like to have joint copyright which she agreed while back, but not now. I doubt she will agree to a joint copyright, and I'm afraid if I push it, she'll get furious," but avers that this was in response to Stacey Engels raising the point that "it's possible that demanding joint ownership of the rights will bring this situation to the breaking point again. if that happens you may have to take legal action against her to prevent her from using her legal connections to try to cut away your rights." *See* ECF No. 97-18 at 3.

38.    On May 16, 2018, Ms. D'Arezzo sent the draft email composed by Stacey Engels to Ms. D'Arezzo, which agreed to Overtime Dance holding the copyright and the proceeds of the book to remain with the same. Ms. D'Arezzo then forwarded this email to the following advisors: Gabriella Gafni, Managing Agent of GMG Ghostwriting Services; Gerard Corragio, Ms. D'Arezzo's Father-in-Law; Claudio D'Arezzo, D'Arezzo's brother; Carol Santangelo, her Legal Aid Services attorney; and Tom Papa, Ms. D'Arezzo's friend. /Travis Decl. Para. 24; Appel Aff. Para. 33; Exhibit "S".

**<u>Response</u>**:

D'Arezzo does not dispute that on May 16, 2018, she sent an email that she had discussed with Stacey Engels to Appel. D'Arezzo does not dispute that her May 16, 2018 email to Appel agreed to Overtime Dance holding the copyright and the proceeds of the book to remain with the same, but avers that based on representations Appel made to her on April 27, 2018, D'Arezzo understood copyright to be limited to management of proceeds, not creative authorship. *See* ECF

No. No. 98-6 at 5; *see also* D'Arezzo Decl. ¶¶ 27-28. D'Arezzo avers that Exhibit S to the Appel

Affidavit does not support the contention that D'Arezzo forwarded her May 16, 2018, email to

Gabriella Gafni, Gerard Corragio, Claudio D'Arezzo, Carol Santangelo, or Tom Papa. *See* ECF

No. 97-19. The correspondence with each of these people pre-date May 16, 2018. *See id*.

(indicating correspondence with Gabriella Gafni on May 11, 2018, Gerard Corragio on May 7,

2018, Claudio D'Arezzo on May 7, 2018, Carol Santangelo on May 7, 2018, and Tom Papa on

May 5, 2018).

39.     On May 18, 2018, Ms. Appel sent a letter to Ms. D'Arezzo in which she told Ms.

D'Arezzo, "It is important to state in writing here, so there can't be any confusion or

misrepresentation, that I chose to write the book in your voice, since it was you who wanted a

book and it was you who wanted to tell the stories we unearthed together. Writing from your

voice felt necessary and true. However, because I had the skills and patience to craft a

manuscript that channeled your voice does not mean that I was not the author, that I did not give

the book full expression." /Appel Aff. 31; Exhibit "P", Page 3, Para. 5.

**Response**:

D'Arezzo does not dispute that Appel sent her a letter by email on May 18, 2018, and

that the cited excerpt is contained within that longer letter.

40.     Ms. Appel also expressed in the May 18, 2018 letter that although Overtime

Dance would in fact manage the costs for the book and the funds raised for the purpose of

keeping the book in print and for promotion, regarding the copyright, Ms. Appel had been

advised that it would be preferable for herself to hold the copyright. Ms. Appel stated, "Since the

copyright has to be managed by whoever has it, I believe that it would be more complicated, at

this time, for it to be managed through the foundation." /Appel Aff. Para. 36; Exhibit "P", Page 3, Para. 2.

**Response**:

D'Arezzo does not dispute that Appel's May 18, 2018 letter indicated that it was Appel's view that Overtime Dance Foundation would manage costs for the book and the funds raised. That portion of the letter reads "[c]ontinuing to have the foundation manage the costs for the book and the funds raised, as well as manage proceeds from book sales is a good decision. The foundation is tax-exempt and is a safe way to hold the money so it can be used to keep the book in print and for promotion." *See* ECF No. 97-16 at 2. D'Arezzo also does not dispute that Appel's May 18, 2018 letter indicated that Appel had received advice on the copyright. The cited excerpt is properly read in the context of the full paragraph, which reads:

> Regarding the copyright, I did explore further the benefit of having the foundation hold the copyright, versus my holding it, and have been advised that, ***at this time***, it is preferable for me to hold the copyright, because it is a simpler and more flexible option. Since the copyright has to be managed by whoever has it, I believe that it would be more complicated, ***at this time***, for it to be managed through the foundation. ***If we proceed with publication***, I am understandably eager to find the most efficient solutions to our questions and avoid further delay.

*Id*. At 3. (emphasis added).

41.    On May 18, 2018, Ms. D'Arezzo sent Ms. Appel an email in which she stated, "Let's move forward with the book. I am as eager as you are to get it published." / Appel Aff. Para 37; Travis Decl. Para 20; Exhibit "P", Page 5; Exhibit "K" Day 3 D'Arezzo Deposition 222:1-223:18.

**Response**:

D'Arezzo does not dispute that she sent Appel an email in which she stated, "Let's move forward with the book. I am as eager as you are to get it published." This occurred on May 21, 2018. *See* ECF No. 97-16 at 5. D'Arezzo avers that the cited portion of her deposition testimony makes clear that when she proposed moving forward with publication, she thought the terms she offered to Appel as a compromise remained operative. *See* ECF No. 97-11 at 221:4-223:11.

42.    On May 22, 2018, Ms. D'Arezzo sent to Stacey Engels an email in which she stated the following: "If [Cathy] holds the copyright of the book, the poem is included. I'm assuming she has already copy-written the book," and later she stated, "If she signs the copyright agreement, her name will appear on the book. Why is it more flexible and easier to manage the copyright herself rather than the foundation, she is the foundation. Prior to what happened, she wanted the foundation to have the copyright. I'm not going to argue at this point, but if we both collaborated, the copyright should be joint." /Appel Aff. Para. 39; Travis Decl. Para. 21; Exhibit "Q"; Exhibit "K" Deposition of D'Arezzo, Page 230:7-231:7.

**Response**:

D'Arezzo does not dispute that she sent Stacey Engels an email on May 22, 2018 and that the cited excerpt is contained within that longer email.

43.    On May 24, 2018, Ms. D'Arezzo sought the advice of Carol Santangelo, her attorney at Legal Aid Services. Ms. Santangelo wrote, "Your conversation with me yesterday made it clear that you are satisfied with having the book published by the foundation, without the involvement of a lawyer, and in your email to Cathy you told her to move ahead with the book. So I advised pro bono today that you had decided to proceed with the publication without their involvement." /Travis Decl. Para. 25; Exhibit "T".

**Response**:

D'Arezzo does not dispute that she sent Carol Santangelo an email on May 24, 2018 and that the cited excerpt is contained within that longer email, indicating that D'Arezzo thought she was agreeing to Overtime Dance Foundation holding the copyright to *The Salty Mountain*.

44.    Based on Ms. D'Arezzo's representation of agreements to her May 16, 2018 terms, Ms. Appel spent the remainder of 2018 finalizing the manuscript and publication of *The Salty Mountain*. Ms. Appel hired and collaborated with Naima Rauam on the illustrations seen throughout the book. Ms. Appel hired and collaborated with Robert Wilson on the overall design of the book. Ms. Appel hired and collaborated with Thomson Shore and Itasca Books for the publication and printing of the book. /Appel Aff. Para. 41.

**Response**:

D'Arezzo does not dispute that she sent Appel certain terms on May 16, 2018, under which she wished to proceed. *See* Pl.'s Resp. to Defs.' SOMF ¶ 38. D'Arezzo also does not dispute that she accepted terms as she understood them on May 18, 2018. *See* Pl.'s Response to Defs.' SOMF. ¶ 41. D'Arezzo also does not dispute that Appel moved forward with finalizing the manuscript and publication of *The Salty Mountain*, but does dispute that she did so under the May 16 terms. D'Arezzo avers that Appel had already filed for copyright under her name alone on April 22, 2018, without disclosing to D'Arezzo that she had done so. *See* Pl.'s Response to Defs.' SOMF ¶ 2; *see also* ECF No. 98-1. D'Arezzo does not dispute that Appel hired and collaborated with Naima Rauam on the illustrations, Robert Wilson on the overall design, and Thomson Shore and Itasca Books for the publication and printing of *The Salty Mountain*.

45.    *The Salty Mountain* was published in early 2019. Two months after its first publication, Ms. Appel received a letter from an organization called Mediate Art [sic], which

sought to mediate a dispute between her and Ms. D'Arezzo as to the authorship of the book. /Appel Aff. Para. 42.

**Response**:

D'Arezzo does not dispute that *The Salty Mountain* was published on January 10, 2019. D'Arezzo does not dispute that MediateArt sent Appel a letter in March 2019. D'Arezzo avers that Appel sent a response indicating she believed the dispute related to "the concept of authorship under intellectual property law." *See* Dimon Decl. ¶ 12, Ex. H. Appel concluded that D'Arezzo "is either unwilling to understand, or incapable of understanding."

46.    Ms. D'Arezzo has brought this lawsuit because she feels entitled to proceeds from book sales of *The Salty Mountain*. /Travis Decl. Para. 12; Exhibit "F" Day 1 Deposition of D'Arezzo 54:19-55:21.

**Response**:

D'Arezzo does not dispute that she is entitled to a portion of profits, if any, from book sales of *The Salty Mountain*, because she co-authored the work. D'Arezzo avers that more centrally, she brought this lawsuit to protect her rights as co-author. *See* ECF No. 97-6 at 59:20-23. The cited portion of D'Arezzo's deposition testimony does not support the contention that the driving factor behind this lawsuit is proceeds from book sales of *The Salty Mountain*.

**Additional Material Facts As To Which Exist Genuine Issues To Be Tried**

47.    Appel was aware of the imbalance that existed between her and D'Arezzo in terms of education and publication experience. Appel has four Master's degrees and two clinical licenses. *Id*. at 6:21-8:3. D'Arezzo has a high school education and has not received any writing instruction at the graduate or undergraduate level. *See* Dimon Decl. ¶ 5, Ex. A at 12:6-8. In addition to her educational credentials, Appel has professional experience in writing and

publishing. *Id*. at 8:17-10:5. Appel was also aware of the imbalance that existed between her and D'Arezzo in terms of this practical experience. *See*, *e.g.*, ECF No. 98-6 at 1 ("Naturally, I was aware that, as an artist and as a writer with two MFAs in writing, I was bringing a lot to the table."). As they worked together, each knew that their credentials were imbalanced. D'Arezzo Decl. ¶ 8. D'Arezzo relied upon and deferred to Appel's expertise throughout their collaborative work on *The Salty Mountain*, particularly as Appel made D'Arezzo feel that the path to publishing her book was through Appel. *Id*. at ¶¶ 8, 12. Appel was fully aware of this reliance. *See* ECF No. 98-6 at 4 (April 27, 2018 email from Appel to D'Arezzo noting that D'Arezzo "went along with everything [Appel] was telling [her], asking [her] and explaining.")

48.     While Appel was employed at ICD, the two worked privately together on *The Salty Mountain* in Appel's office. *See* ECF No. 97-6 at 45:4-6. Appel offered to help D'Arezzo achieve her dream of writing a book. She was not solicited. D'Arezzo Decl. ¶¶ 4-5.

49.     Over the years, Appel consistently referred to *The Salty Mountain* manuscript as belonging to D'Arezzo. Appel spoke of their project as if D'Arezzo were the author and Appel was helping to bring the creative dream to fruition. Many, if not all, of Appel's references to *The Salty Mountain* as belonging to D'Arezzo were unprompted, and for those that were in response to a comment by D'Arezzo, Appel never corrected her phrasing and indicated she felt she had an ownership stake in the book as well. D'Arezzo Decl. ¶¶ 12-18, Exs. 2-7; Dimon Decl. ¶¶ 6-8, Exs. B-D.

50.     When it came time to prepare to publish *The Salty Mountain*, Appel designed a fundraising campaign to promote the book and raise the necessary funds. The campaign included several references to D'Arezzo as author and Appel as scribe. The campaign also included a flier with the text "A New Book by Angela D'Arezzo" and an image of the cover of *The Salty*

*Mountain*, with the words "Angela D'Arezzo with Cathy Appel" at the bottom. The cover of *The Salty Mountain* was particularly significant given Appel's January 2018 explanation to D'Arezzo that the use of "with" indicated one author and one assistant. Appel helped publicize the fundraising campaign by posting it to her Facebook page, where it remained until at least April 5, 2019. D'Arezzo Decl. ¶¶ 15, 18-20, Exs. 7-9; Dimon Decl. ¶ 8, Ex. D.

51.    The fundraiser ultimately raised over $8,000, much of which came from D'Arezzo's friends and family. D'Arezzo Decl. ¶ 21, Ex. 10.

52.    As the pair continued working towards publication—now with significant funds to do so—Appel continued to reassure D'Arezzo that *The Salty Mountain* was hers. D'Arezzo Decl. ¶ 22; Dimon Decl. ¶ 9, Ex. E.

53.    Despite the tension that followed their April 4 meeting with Carol Santangelo, certain things remained the same. Appel still held herself out as caring about D'Arezzo's interests, reassuring her that everything could wait until D'Arezzo had the information she needed to feel comfortable. Appel also told D'Arezzo that she was willing to agree that decisions about the book had to be made jointly. D'Arezzo Decl. ¶¶ 26-27, Ex. 11; *see also* ECF No. 98-5 at 3.

54.    Despite representing to D'Arezzo that she would put everything on hold, and that decisions concerning the book should be made jointly, Appel unilaterally filed for sole copyright of *The Salty Mountain* on April 22, 2018 without consulting D'Arezzo or telling her of her actions. Dimon Decl. ¶ 5, Ex. A at 262:2-269:20; D'Arezzo Decl. ¶ 29; ECF No. 98-1.

55.    Appel continued to make representations to D'Arezzo about the responsibility she felt to be honest with D'Arezzo about the future of *The Salty Mountain*. D'Arezzo Decl. ¶ 30; ECF No. 97-16 at 4.

56.     In the course of unilaterally filing for sole copyright of *The Salty Mountain*, Appel made representations to the Copyright Office about what was important to D'Arezzo without consulting D'Arezzo. Dimon Decl. ¶ 5, Ex. A at 89:19-93:19; *see also* Dimon Decl. ¶ 11, Ex. G.

57.     During the summer of 2018, Appel periodically updated D'Arezzo about the publication process. In those updates, Appel used language once again indicating that she felt the book was a joint endeavor. D'Arezzo Decl. ¶ 31, Exs. 12-16.

58.     Appel's fraudulent application for sole copyright of *The Salty Mountain* was approved on August 2, 2018 (retroactive to the date of application) after exchanging five emails with Meredith Wearing, a Copyright Examiner. *See* ECF No. 98-1; *see also* Dimon Decl. ¶ 11, Ex. G. In those emails with Wearing, Appel was twice presented with reasons why D'Arezzo would ordinarily appear on the Copyright. Appel—determined to have her name alone on the Copyright—revised her explanation to the Copyright Office and twice indicated a wish or preference on behalf of D'Arezzo without informing her. *See* Dimon Decl. ¶ 11, Ex. G.

59.     By late 2018, D'Arezzo made repeated requests that Appel send her the final manuscript of the book. Appel stonewalled these requests. D'Arezzo Decl. ¶ 32, Exs. 17-19.

60.     D'Arezzo found out the most significant update about *The Salty Mountain* through her own diligence. Her brother Claudio, who had donated to the fundraiser Appel coordinated, received an update about the book's publication, which prompted D'Arezzo to google the book. It was then that D'Arezzo learned Appel had secretly filed for copyright as sole author. Appel did not respond to D'Arezzo's email asking about this. D'Arezzo Decl. ¶ 33, Ex. 20.

61.     D'Arezzo asserted her legal rights as diligently as she could under the circumstances. With the help of two *pro bono* attorneys, and through the global pandemic, D'Arezzo filed this lawsuit on January 7, 2022. D'Arezzo Decl. ¶¶ 34-38.

Dated: July 12, 2024                              **VENABLE LLP**
       New York, New York

                                      By:      /s/ *Anna G. Dimon*

                                            John C. Vazquez
                                            Anna G. Dimon
                                            Nicholas G. Miller
                                            151 West 42nd Street
                                            New York, NY 10036
                                            Tel.: (212) 307-5500
                                            Fax: (212) 307-5598
                                            jcvazquez@venable.com
                                            agdimon@venable.com
                                            ngmiller@venable.com

                                            *Pro Bono Attorneys for*
                                            *Plaintiff Angela D'Arezzo*