```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  10/03/2024
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Angela D'Arezzo,

                                        Plaintiff,

            -against-

Catherine Appel and Overtime Dance
Foundation, Inc.,

                                        Defendants.

1:22-cv-00177 (SDA)

**OPINION AND ORDER**

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

This case centers around a dispute over the authorship of *The Salty Mountain*, a book that tells the story of Plaintiff Angela D'Arezzo ("Plaintiff" or "D'Arezzo") and her life and family in Italy. *See D'Arezzo v. Appel*, No. 22-CV-00177 (PAE) (SDA), 2023 WL 5020344, at *1 (S.D.N.Y. May 31, 2023), *report and recommendation adopted*, 2023 WL 4362989 (S.D.N.Y. July 6, 2023). Pending before the Court is a motion by Defendants Catherine Appel ("Appel") and Overtime Dance Foundation, Inc. ("Overtime Dance") (together, the "Defendants"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, for an Order granting summary judgment dismissing Plaintiff's First Amended Complaint. (Defs.' 5/30/24 Not. of Mot., ECF No. 96.) For the reasons set forth below, Defendants' motion is GRANTED IN PART and DENIED IN PART.

**FACTUAL BACKGROUND**

Appel is the President and Artistic Director of Overtime Dance. (Defs.' 56.1, ECF No. 99, ¶ 1; Pl.'s 56.1 Resp., ECF No. 105, ¶ 1.) Appel worked for twenty years at the International Center for the Disabled ("ICD") developing and running the Creative and Movement Arts Program in the

Behavioral Health Department. (Defs.' 56.1 ¶ 3; Pl.'s 56.1 Resp. ¶ 3.) Appel left ICD in or about 2012. (Defs.' 56.1 ¶ 16; Pl.'s 56.1 Resp. ¶ 16.)

D'Arezzo has muscular dystrophy and previously received care at ICD, where Appel and D'Arezzo met. (Defs.' 56.1 ¶¶ 5-6; Pl.'s 56.1 Resp. ¶¶ 5, 6.) Between 2005 and 2012, Appel and D'Arezzo worked together on creating a work that eventually became *The Salty Mountain*. (*See* Defs.' 56.1 ¶¶ 8-9; Pl.'s 56.1 Resp. ¶¶ 8-9.) Appel asserts that she wrote all the material from 2005 and 2012 on her computer during her writing sessions with D'Arezzo, but D'Arezzo contends that she wrote portions of *The Salty Mountain* outside of Appel's presence, and brought those materials to the writing sessions with Appel. (Defs.' 56.1 ¶ 9; Pl.'s 56.1 Resp. ¶ 9.)

During the period 2012 through 2016, Appel asserts that the work on *The Salty Mountain* came to a halt, but D'Arezzo contends that she and Appel continued to meet, but with less frequency. (Defs.' 56.1 ¶ 16; Pl.'s 56.1 Resp. ¶ 16.) Between 2012 and 2016, Appel consistently shared the material from the ICD years with D'Arezzo upon request. (Defs.' 56.1 ¶ 17; Pl.'s 56.1 Resp. ¶ 17.) Also during this period, D'Arezzo would request Appel to make corrections to spelling and Italian accents to the book material, and Appel would make those corrections. (Defs.' 56.1 ¶ 18; Pl.'s 56.1 Resp. ¶ 18.) In or around 2016, Appel retired and had more time to work on *The Salty Mountain*. (Defs.' 56.1 ¶ 20; Pl.'s 56.1 Resp. ¶ 20.)

During the period late 2016 through early 2018, Appel asserts that she organized the material into a cohesive narrative with a point of view and a beginning, middle and end, but D'Arezzo contends that she and Appel collaborated in this endeavor and that Appel solicited D'Arezzo's input on narrative, flow and shape. (Defs.' 56.1 ¶ 21; Pl.'s 56.1 Resp. ¶ 21.)

On April 4, 2018, Appel and D'Arezzo had an in-person meeting with Carol Santangelo, D'Arezzo's attorney from Legal Aid Services ("Attorney Santangelo"). (Defs.' 56.1 ¶ 27; Pl.'s 56.1 Resp. ¶ 27.) Appel asserts that, at this meeting, Appel learned for the first time that D'Arezzo wanted the sole copyright for *The Salty Mountain* for the purpose of selling the book, and maybe even the movie rights, and Appel strongly objected to such plan during the meeting. (Defs.' 56.1 ¶ 27.) D'Arezzo contends that the meeting was set up for the express purpose of discussing potential book proceeds, and that Appel was aware of this, and that, at the meeting, Appel attempted to secure D'Arezzo's signature on a contract related to ownership of *The Salty Mountain*, but that Attorney Santangelo advised D'Arezzo against signing without knowing what it was she was agreeing to, and D'Arezzo did not sign the agreement. (Pl.'s 56.1 Resp. ¶ 27.)

On April 14, 2018, D'Arezzo sent an email to Appel, which stated:

I feel that you are not pleased as I am because of this agreement on the publishing of the book. I appreciate everything you have done, but I didn't have a clear understanding about the copyright, etc., and would like to learn more about the options so that I can be comfortable with the choice I make and we can move forward.

I sincerely suggest that we get together as before, as good friends, so we can achieve a peaceful and productive outcome out of this issue.

I hope you will understand that I'm a newcomer to this field and don't know all the mechanics of it.[]

I sincerely want this project to go forward since it has been a shining star in my dreams.

Looking forward hearing from you.

(Ex. Y to Appel Aff., ECF No. 98-5, at 4.)

On April 15, 2018, Appel sent a lengthy response to D'Arezzo stating, in part, as follows:

I appreciate hearing your thoughts, and improved communication between us *is* necessary.

However, at least for now, I don't see any purpose in getting together or talking by telephone, since so much of what has already been said and agreed upon is in question.

. . .

Reasons it seems we are now at a crossroads:

. . .

4. The factors to be considered in deciding how to proceed are twofold: the content of the book for the most part is made up of family stories that are yours. There is also well-researched historical content, but the personal stories and experiences are not mine. The actual written text, however, is from me, including the sequencing, shaping and flow of the entire narrative with various artistic structures, such as the title *The Salty Mountain*. I have always considered writing this material with you as a mutual project we were undertaking for all who might enjoy or benefit emotionally and intellectually from what we were creating.

5. I have taken this project as far as I am willing and will not give up copyright of my written material to anyone, or entity other than Overtime Dance Foundation, Inc. It is too late in what has already been an overly long process to drag the project out any longer.

6. I am perfectly willing to agree to stipulations that the book is not for monetary gain, and that neither of us can make any decision about *The Salty Mountain* that does not have the consent of the other. Upon reflection and recent developments, I do not agree to free the copyright, or management of the copyright to *The Salty Mountain* to any entity other than Overtime Dance Foundation, Inc., or to an entity or persons chosen by the foundation to manage the creative, social and academic integrity of *The Salty Mountain* as intended by me, and [as I had previously thought was] intended by you.

7. My understanding at this juncture, is that if the above plan – the plan that I believed we had developed to work toward – is not acceptable to you, we will not publish *The Salty Mountain*. As far as I'm concerned, you would be free to take the manuscript and share it informally with family and friends, but could not publish it. Alternatively, you could use *The Salty Mountain* manuscript as a detailed reference from which to write your own book, or to have someone else write your book. You would have to find a new title, a new organizational and artistic narrative format, and use your own language, or hire an author to assist you to tell your story in order to publish.

8. At the same time, I would agree to never publish *The Salty Mountain* manuscript, but to preserve it as a creative and educational exercise. My interest

is in protecting the integrity of the manuscript and the 20 years of work we did together to produce that outcome.

. . .

You have my full support to think of what your dreams truly are, so that they can be realized one way or another. Changing our plans would be inconvenient and disruptive, but this is still preferable to conflict or unwanted compromise that could follow us into the future and permanently damage the remarkable history of our twenty years of work together.

You have my permission to share this letter with whomever you are consulting and I am available to answer any questions.

(*Id*. at 1-4 (emphasis and alterations in original).)

On April 22, 2018, Appel filed a copyright registration listing herself as the sole author of

The Salty Mountain. (Appel Dep. Tr., ECF No. 102-1, at 266; *see also* Cert. of Registration

(TXU002099480), ECF No. 93-23, at PDF p. 1.)

On April 27, 2018, Appel sent D'Arezzo a letter (attached to an email) stating, in part:

. . .

. . . During [the] four-year period [*i.e.*, 2012 to 2016], we transitioned more and more to my working on my own and then us meeting in person when it was possible. For the most part, I would email you my drafts via your brother's email and he would print out the work and hand deliver it to you. It was slow going, but you looked over my drafts, and our in-person meetings shifted primarily to the telephone.

You put many hours into getting the dialect right, and we worked hard to make the Gallese dialect with proper accents correct and to fulfill the goal of including the unique language of Gallo as well as formal Italian when necessary. This decision to include the dialect was to support your involvement with the manuscript, although, as we both know, it made for a great deal of extra work that had little relevance to the actual stories. . . .

The process of giving the book a cohesive structure, which took a lot of work on my part in writing and then sharing options and decisions with you step by step, was also tedious but rewarding. Again, I did not do this work as a volunteer, but as a partner. . . .

In the last few years, whenever we would meet, your drive to publish seemed stronger, and we would talk about your aging parents and your own health and things going on for me that were pressures to wrap the project up and see if we could move to publication. Your urgency for publication intensified. But the only focused conversations we had about publication, were about fear that your disability benefits could be put at risk if you were part of a book that was being sold. You and I had frequent and lengthy conversations about the book not being for the purpose of making money, and, as I have mentioned, I kept urging you to contact your Legal Aid attorney so we would know how to proceed. I was partnering you in a creative project that had shifted in intensity and left me with growing responsibilities to be sure your dreams were safely met.

. . .

Writing is not something you've done much of, but you are filled with energy and have an artistic soul that is a large part of who you are. These qualities are strengths and they, not your need, not your disability, are what engaged me to meet you as an artist. You are selling yourself short in trying to take credit for what you didn't do and ignoring the larger, more unique aspects of your accomplishments with this manuscript and in remaining a vital part of an ever-growing creative achievement.

Ironically, by diminishing my role in the process of creating this book, you are diminishing yourself. Perhaps you never once mentioned ownership — copyright or "doing whatever you want" with the book — because you always knew it was not your sole creation. . . .

Even though we may not have thought through the specifics of copyright, in our effort to finish and publish the book, I have always thought of it as a joint endeavor and never imagined you would want to claim the book as solely yours. It was so evident that it wasn't solely yours, and that ownership or monetary gain were never what the book, or our process, were about. Therefore, I wonder, "What does the copyright mean to you?" I also wonder, "What does it mean to you to have someone else guide you in such a deep journey of finding your stories and then in making them visible through research and writing?"

As it is now, having your name on the cover and on almost every page makes you the center of the book. It is more prestigious for you to have written with me and to acknowledge our joint accomplishment than it is to pretend otherwise. As I have explored copyright further, I understand more fully that copyright is a construct that has to do with management of, and monetary gain from, a published work.

As the sole author of the book written in close consultation with you, I have a strong interest in protecting the integrity of the manuscript. The way I see it, your

legacy with this project is the existence of the stories and your hard work toward having them excavated and accurately preserved through writing. The writing itself does not belong to you and is therefore not your legacy.

. . .

Points to consider:

. . .

4. I am not taking anything away from you by acknowledging the true nature of the authorship of The Salty Mountain. As I have thought further about the authorship of The Salty Mountain, as a result of your not wanting to jointly sign the MAP Author Agreement, I have become more convinced than ever that clearing up any confusion and questions is necessary. I now realize that we must each take our rightful place in the story of our creative process and the creation of the book The Salty Mountain.

. . .

8. Through our friendship, you have become part of a community, and through our process, many people have become interested in what we are doing and have been supportive of our endeavor. These people know the nature of what we've been doing and for them it is not about your "sole" authorship of a book, but about your engagement in a process of art-making and relationship that is inspiring and informative.

9. All of the people who have joined in support of our work on the book project, and/or have come to know you through it, also know that you are not the sole author, and it doesn't matter to them. . . .

(Ex. Z to Appel Aff., ECF No. 98-6, at 3-8.)

On or about April 30, 2018, D'Arezzo sought the advice of Tom Papa, a friend of hers, concerning her dispute with Appel. (Defs.' 56.1 ¶ 31; Pl.'s 56.1 Resp. ¶ 31.) On May 4, 2018, D'Arezzo sent a letter to Appel in which D'Arezzo stated, in part:

. . . Although[] I don't agree with some of the details you represented[,] I am aware that this manuscript was a very long and tedious process, and I agree that it can be considered a joint project. . . .

. . . You write the book because there is a passion you want to share, and whatever happens afterwards happens.  No one know whether it's going to make a sale or not, but to me, it's common sense that if it does sell, the royalty goes to the person

who wrote the book, in this case, the stories are mine, but you structured the phrases, so, thinking it over, it was a partnership, and I'm proud to have written this book with you.

In hopes of resolving these differences and in consideration of your time and help in this collaboration to complete this project, I would like to propose that we both take credit for the book and agree to a joint copyright, and a 50/50 share in any proceeds that may come from it – 50 percent can go the foundation or wherever else you decide, and 50 percent can go to my trust.

(Ex. F to Dimon Decl., ECF No. 102-6, at PDF p. 3.)

On May 4, 2018, Appel sent an email to D'Arezzo enclosing a letter in which Appel responds to certain portions of D'Arezzo's May 4 letter. (Ex. N to Travis Decl., ECF No. 97-14.) In her letter, Appel stated in part:

The stories involved events that happened to you, your family and friends, as well as to Italy. The literary shaping and telling of these stories in "The Salty Mountain" is an exploration and interpretation of these events in a writing that was entirely created by me. As I have said in my previous letters, the surprise to me, as we began to work toward the goal of having a book, was how little you had in the way of actual stories, of any cohesive material developed enough to be written. As a result, I chose not to abandon the project with you and, instead, treated what we were doing as a process of finding material to write about, that might or might not lead to publication. As we have said, this process was laborious and time consuming. If you had had the stories, I could have written the book quickly. Instead, however, you had only fragments of stories and limited information. I thought it was important to you, and to both of us in our endeavor, to try to find and to clarify the stories. And, as I said in my previous letter, more and more, you became the subject of the project. I did not merely structure the phrases. I wrote every word and worked tirelessly with you to get at what, exactly, the stories were and how to write them clearly. And I, then, worked on how to write the stories into an overall narrative that would be a book, and, simultaneously, with you to be sure that you understood and were with me in the decisions.

. . .

Sadly, as Ms. Santangelo had advised, taking time "to do this right" was, in fact, good for both of us. As a result of this extra time, further investigation and legal consultation on my part, as well as seeing a side of your intentions that had been withheld from me, I now want to adhere fully to the confines of the copyright law, because we did not co-author this book. Yes, it was a collaborative effort, but the actual writing of the work was entirely mine. The only part of the project that can

be copyrighted is the text of *The Salty Mountain*, and the text is unmistakably mine. Ideas cannot be copyrighted; and neither can stories.

I do not agree to a joint copyright in the book; or that we are co-authors. Yes, we did collaborate on a project that I generously allowed you to receive as much credit for as possible. I was and still am happy to do that for you. But, I will not fabricate or be part of untruths. . . .

(*Id*. at PDF pp. 2-4 (emphasis in original).)

On May 11, 2018, D'Arezzo emailed Gabriella Gafni ("Gafni"), the Managing Agent of GMG Ghostwriting Services, about D'Arezzo's dispute with Appel. (Defs.' 56.1 ¶ 36; Pl.'s 56.1 Resp. ¶ 36.) D'Arezzo's email sent at 2:10 p.m. on May 11, 2018 states, in part:

[Appel] wants her foundation to own the book with all the rights, I'll only be the author without any rights. She is now saying that she doesn't agree to a joint copyright of the book; or that we are co-authors. She just wants me to receive as much credit for as possible and that yes, it was a collaborative effort, but she says the actual writing of the work was entirely hers. The only part of the project that can be copyrighted is the text of The Salty Mountain, and she says the text is unmistakably hers and that ideas cannot be copyrighted, and neither can stories.

(Ex. O to Travis Decl., ECF No. 97-15, at PDF p. 3.) In an email sent to Gafni at 3:03 p.m. on May 11, 2018, D'Arezzo states that "[Appel] claims that the whole manuscript is hers." (*Id*. at PDF p. 1.)

On May 14, 2018, D'Arezzo emailed Stacey Engels, a writer that D'Arezzo had worked with in the past, about D'Arezzo's dispute with Appel. (Defs.' 56.1 ¶ 37; Pl.'s 56.1 Resp. ¶ 37.) In an email D'Arezzo sent at 4:28 p.m. on May 14, 2018, D'Arezzo stated that she "would really like joint copyright." (Ex. R to Travis Decl., ECF No. 97-18, at PDF p. 3.) In a responsive email sent at 4:43 p.m., Engels stated: "[I] feel you should at least co-own the rights. [H]owever, [I] also feel she is no longer rational and that you should prepare yourself to take legal action as she may only

be willing to move forward if she gets everything her way." (*Id*.) D'Arezzo then stated in an email

to Engels sent at 5:54 p.m.:

> [Appel] will have all the rights unless I stop the process and get legal action. If she
> refuses to have me as an author, I will stop the process. When she asked me to
> write the acknowledgment list, I did state that without her help, the book wouldn't
> have been written. She used that against me. As we discussed at lunch, it is best
> to get the book published and let her retain the rights or take legal action and the
> book will not be published. I want the book published, even though, I'm not totally
> happy.

(*Id*.) D'Arezzo later stated in an email to Engel sent at 9:40 p.m. as part of the same email chain:

"I doubt [Appel] will agree to a joint copyright, and I'm afraid if I push it, she'll get furious. I don't

think it[']s fair that she has to have it her way or it doesn't get done. It will probably get uglier if

I do get a lawyer involved." (*Id*. at PDF p. 2.) At 10:26 p.m., Engel responds as follows: "[I] agree,

if you don't [do] things her way, it will likely mean the end of the book and [I] think you would

have to get a lawyer involved to be sure she doesn't go ahead and publish it as her own." (*Id*.) In

the last email from D'Arezzo to Engel on May 14, 2018, which was sent at 10:39 p.m., D'Arezzo

asked Engel: "What can she do with the book if she has all the rights[?]" (*Id*.)

On May 15, 2018, at 5:59 a.m., as part of the email chain referred to in the prior

paragraph, Engel sent an email to D'Arezzo providing the name and website address for an

organization known as Volunteer Lawyers for the Arts ("VLA"), www.vlany.org.[1] (Ex. R to Travis

Decl.at PDF p. 1.) At 4:20 p.m., D'Arezzo thanks Engels for the VLA website and states: "I'm

planning to go with the first email - me having the copyright of my photos, poem and authorship.

If that doesn't happen, I would have to involve a lawyer." (*Id*.) In the last email in the chain, sent

by Engels at 4:56 p.m., Engels states to D'Arezzo:

---

[1] According to its website, VLA provides the artistic community with access to free or low fee legal services.

[I] think you're taking the best possible steps - getting some legal advice, doing what you can to go forward and get the book done, and preparing to take legal action if [Appel] doesn't give you the rights you ask for.

[B]acione,[2] and keep me posted on what the lawyers say[.]

(*Id*.)

On May 16, 2018, D'Arezzo sent to Appel the email that D'Arezzo had discussed with Engels. (Defs.' 56.1 ¶ 38; Pl.'s 56.1 Resp. ¶ 38.) In the May 16, 2018 email to Appel, D'Arezzo agreed to Overtime Dance holding the copyright with the proceeds of the book remaining with Overtime Dance. (*See id.*; *see also* Ex. S to Travis Decl., ECF No. 97-19.)

On May 18, 2018, Appel sent a letter to D'Arezzo, stating in part as follows:

Regarding the copyright, I did explore further the benefit of having the foundation [*i.e.*, Overtime Dance] hold the copyright, versus my holding it, and have been advised that, at this time, it is preferable for me to hold the copyright, because it is a simpler and more flexible option. Since the copyright has to be managed by whoever has it, I believe that it would be more complicated, at this time, for it to be managed through the foundation.

. . .

In my eyes, your role with the book has always been at the center of what has been written, and I have always felt I wanted both of our names on the cover. However, the issues that we have had to deal with recently reveal that it is important for everyone that I be clear about what I have done and why.

. . .

It is important to state in writing here, so there can't be any confusion or misrepresentation, that I chose to write the book in your voice, since it was you who wanted a book and it was you who wanted to tell the stories we unearthed together. Writing from your voice felt necessary and true. However, because I had the skills and patience to craft a manuscript that channeled your voice does not mean that I was not the author, that I did not give the book full written expression. I am making this point to assure you that, even though you did not write the book,

---

[2] In Italian, "baccione" means "big kiss."

we each did whatever we could in order to achieve the goal we both pursued, of fulfilling your dream to have a publishable book about your early life in Italy.

. . .

You allowed me to write the book on your behalf. My authorship was so evident that it never occurred to me that you would want us to say otherwise. . . .

(Ex. P to Travis Decl., ECF No. 97-16, at PDF pp. 3-4.)

On May 21, 2018, D'Arezzo sent an email to Appel stating: "Let's move forward with the book. I am as eager as you are to get it published." (Ex. P. to Travis Decl. at PDF p. 5.) On May 22, 2018, Attorney Santangelo sent an email to D'Arezzo, stating: "Your conversation with me yesterday made it clear that you are satisfied with having the book published by the foundation, without the involvement of a lawyer, and in your email to [Appel] you told her to move ahead with the book. So I advised pro bono today that you had decided to proceed with the publication without their involvement." (Ex. T to Travis Decl., ECF No. 97-20, at PDF p. 1.) On May 24, 2018, D'Arezzo responded to Attorney Santangelo's email, stating: "I've decided to move ahead with the book with [Appel's] foundation." (*Id*.) During the remainder of 2018, Appel moved forward with finalizing the manuscript and publication of *The Salty Mountain*. (Defs.' 56.1 ¶ 44; Pl.'s 56.1 Resp. ¶ 44.)

In July and August 2018, Appel exchanged emails with the Copyright Examiner regarding the copyright application for *The Salty Mountain*. (*See* Ex. G to Dimon Decl., ECF No. 102-7.) The Examiner raised an issue that the copy of the work submitted by Appel named D'Arezzo as an additional author, but the application did not. (*Id*. at PDF p. 6.) Appel stated that the Copyright Office did not have her permission to add D'Arezzo as co-author and that Appel was the sole author. (*Id*. at PDF pp. 5-6.) On August 6, 2018, the Examiner stated that the application was

approved and that the registration certificate was in the mail. (*Id*. at PDF p. 2.) In 2018 and 2019,

the Copyright Office issued copyright registrations that listed Appel as the sole author of *The Salty*

*Mountain*. (Defs.' 56.1 ¶ 2; Pl.'s 56.1 Resp. ¶ 2.) *The Salty Mountain* was published in early 2019.

(Defs.' 56.1 ¶ 45; Pl.'s 56.1 Resp. ¶ 45.)

## PROCEDURAL HISTORY

This action was commenced on January 7, 2022. (*See* Compl., ECF No. 1.) In her Complaint,

Plaintiff asserted six claims: (1) a claim seeking a declaration that (a) Plaintiff is the sole author of

*The Salty Mountain*, and that (b) Copyright Registration No. TX0008728193 is invalid (Claim I)

(Compl. ¶¶ 55-61); (2) an alternative claim seeking a declaration that *The Salty Mountain* is a

joint work as defined by 17 U.S.C. § 101, and that Plaintiff and Defendant Appel are co-authors

of that work (Claim II) (*id*. ¶¶ 62-68); (3) a copyright infringement claim against Defendants (Claim

III) (*id*. ¶¶ 69-73); (4) a breach of fiduciary duty claim against Defendant Appel (Claim IV) (*id*. ¶¶

74-80); (5) to the extent it is determined that Plaintiff and Defendant Appel are co-authors of *The*

*Salty Mountain*, an accounting claim against Defendant Appel (Claim V) (*id*. ¶¶ 81-84); and (6) a

constructive trust claim against Defendants based upon Defendant Appel's breach of fiduciary

duty (Claim VI). (*Id*. ¶¶ 85-91.)

On March 1, 2022, this action was referred to the undersigned for general pretrial

purposes. (Order of Ref., ECF No. 12.) On August 4, 2022, Defendants sent a letter to District

Judge Engelmayer seeking permission to file a motion to dismiss the Complaint. (Defs.' 8/4/22

Ltr., ECF No. 24.) On August 11, 2022, Judge Engelmayer referred Defendants' anticipated motion

to dismiss for purposes of issuing a report and recommendation. (*See* 8/11/22 Order, ECF No. 28; Am. Order of Ref., ECF No. 29.[3])

On January 27, 2023, Defendants filed their motion to dismiss the Complaint. (Defs.' 1/27/23 Not. of Mot., ECF No. 40.) Defendants argued that Plaintiff's declaratory judgment claims were barred by the statute of limitations; that Plaintiff had failed to state a claim for copyright infringement; and that the Court should decline to exercise supplemental jurisdiction over Plaintiff's remaining claims. (Defs.' 1/27/23 Mem., ECF No. 40-9, at 4-11.)

On May 31, 2023, the undersigned issued a Report and Recommendation recommending that Defendants' motion be granted in part and denied in part. *D'Arezzo*, 2023 WL 5020344, at *1. It was recommended that Defendants' motion to dismiss Plaintiff's claim for a declaration that she was the sole author of *The Salty Mountain* (Claim I) be granted as barred by the three-year statute of limitations under the Copyright Act because, on the face of the Complaint—including the May 18, 2018 email from Defendant Appel to Plaintiff, which was found to have been incorporated by reference in the Complaint—Plaintiff was aware more than three years prior to the filing of the Complaint that Defendant Appel believed herself to be at least a co-author of *The Salty Mountain*.[4] *Id*. at *3.

In the R&R, it was further recommended that Defendants' motion to dismiss Plaintiff's claim for a declaration that she was a joint author of *The Salty Mountain* (Claim II) be denied

---

[3] On January 30, 2023, a second amended order of reference was entered. (2d Am. Order of Ref., ECF No. 41.)

[4] Plaintiff had argued for equitable tolling of the statute of limitations because Defendant Appel purportedly was Plaintiff's psychotherapist and abused this position to dissuade Plaintiff from asserting her rights. *See D'Arezzo*, 2023 WL 5020344, at *4. The R&R found that equitable tolling did not apply because "any treatment relationship between Plaintiff and Appel ended about six years prior to the dispute regarding authorship." *Id*.

because "the allegations on the face of the Complaint [did] not establish that Plaintiff's claim that she and Appel [were] co-authors [was] time-barred." *D'Arezzo*, 2023 WL 5020344, at *4, 6. The R&R found that the allegations in the Complaint and the May 18, 2018 email did not include "an express assertion of sole authorship" by Defendant Appel, as Second Circuit law required. *Id*. at *4 (citing *Horror Inc. v. Miller*, 15 F.4th 232, 257 (2d Cir. 2021)). In support of their motion, Defendants had referred to additional correspondence between Plaintiff and Defendant Appel (not referred to in the Complaint) that they argued showed express repudiation of co-authorship. *Id*. at *5. The R&R found that the Court could not consider the additional correspondence unless it converted Defendants' motion to a motion for summary judgment and permitted Plaintiff to submit additional evidence. *Id*. The R&R "decline[d] to make such a recommendation as it appear[ed] that the question of express repudiation of co-authorship [was] best addressed upon a more developed factual record following discovery." *Id*. at *6.

Finally, Defendants had moved to dismiss Plaintiff's remaining claims (*i.e.*, Claim IV (breach of fiduciary duty), Claim V (accounting) and Claim VI (constructive trust)) on the sole ground that the Court should decline to exercise supplemental jurisdiction over claims arising under state law. *D'Arezzo*, 2023 WL 5020344, at *6. Because the R&R recommended that Defendants' motion be denied as to Claim II, which arose under federal law, it did not recommend dismissal of the Claims IV through VI. *Id*.

Neither Plaintiff nor Defendants filed any objections to the R&R. On July 6, 2023, Judge Engelmayer entered an Order adopting the R&R, stating that the R&R was "well-reasoned and thorough." *D'Arezzo*, 2023 WL 4362989, at *2.

On July 28, 2023, Defendants filed their Answer to the Complaint, in which they assert a statute of limitations defense. (Defs.' 7/28/23 Ans., ECF No. 59, ¶ 10.) On July 31, 2023, Plaintiff filed a Letter Motion seeking leave to file an amended pleading. (Pl.'s 7/31/23 Ltr. Mot., ECF No. 60.) Plaintiff indicated that she wished to amend Claim II to include Copyright Registration No. TXU002099480, in addition to the copyright registration number at issue in the Complaint (No. TX0008728193), explaining that the registration ending in 480 concerned the manuscript to *The Salty Mountain*, and the registration ending in 193 concerned the published book. (*Id*. at 1.)

On August 1, 2023, the parties consented to the jurisdiction of the undersigned for all purposes, and on August 2, 2023, Judge Engelmayer entered an Order referring this action to the undersigned for all purposes. (8/2/23 Consent, ECF No. 62.) On August 3, 2023, Plaintiff's motion to amend was granted on consent. (*See* 8/3/23 End., ECF No. 63, at 5.)

On August 10, 2023, Plaintiff filed her First Amended Complaint ("FAC"). (FAC, ECF No. 67.) The First Amended Complaint alleges four claims, *i.e.*, (1) a claim seeking a declaration that *The Salty Mountain* is a joint work as defined by 17 U.S.C. § 101, and that Plaintiff and Defendant Appel are co-authors of that work (Claim II) (*id*. ¶¶ 55-61); (2) a breach of fiduciary duty claim against Defendant Appel (Claim IV) (id. ¶¶ 62-68); (3) to the extent it is determined that Plaintiff and Defendant Appel are co-authors of The Salty Mountain, an accounting claim against Defendant Appel (Claim V) (*id*. ¶¶ 69-72); and (4) a constructive trust claim against Defendants based upon Defendant Appel's breach of fiduciary duty (Claim VI) (*id*. ¶¶ 73-79), which are the three claims that survived Defendants' motion to dismiss. The FAC notes that Claims I and III previously were dismissed. (FAC at pp. 9-10.) On August 21, 2023, Defendants filed an Answer to

the FAC, in which they assert a statute of limitations defense. (Defs.' 8/21/23 Ans., ECF No. 69, ¶ 10.)

Following the completion of discovery, on May 30, 2024, Defendants filed the motion for summary judgment that is now before the Court. (*See* Defs.' 5/30/24 Not. of Mot.) In accordance with Local Civil Rule 56.1, Defendants filed a Statement of Material Facts in Support of Summary Judgment. (*See* Defs.' 56.1.) On July 2, 2024, Plaintiff filed her memorandum in opposition to Defendants' motion (*see* Pl.'s 7/12/24 Opp. Mem., ECF No. 104), as well as a Response to Defendants' Statement of Material Facts and Counterstatement of Material Facts. (*See* Pl.'s 56.1 Resp.) On August 21, 2024, Defendants filed a reply memorandum (Defs.' 8/21/24 Reply, ECF No. 109), but Defendants did not respond to Plaintiff's 56.1 counterstatement. The Court held oral argument on September 20, 2024. (9/20/24 Tr., ECF No. 115.)

## LEGAL STANDARDS

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321-23 (1986). "A fact is 'material' for these purposes when it 'might affect the outcome of the suit under the governing law.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). A dispute concerning material fact is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Id*. (quoting *Anderson*, 477 U.S. at 248).

Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc*., 68 F.3d 1451, 1456 (2d Cir. 1995)). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co*., 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

<u>**DISCUSSION**</u>

Defendants move for summary judgment dismissing each of Plaintiff's remaining claims, which are considered in turn.

**I.    <u>Declaratory Judgment Claim (Claim II)</u>**

Claim II of the FAC seeks a declaration that *The Salty Mountain* is a joint work as defined by 17 U.S.C. § 101 and that Plaintiff and Defendant Appel are co-authors of that work. (FAC ¶ 60.) Plaintiff also seeks a declaration that Copyright Registration Nos. TXU002099480 and TX0008728193 are invalid, or in the alternative, an order compelling Appel to complete and file Supplementary Copyright Registrations identifying D'Arezzo as a joint author. (*Id*. ¶ 61.)

Defendants argue that Claim II is barred by the Copyright Act's statute of limitations.[5] (Defs.' 5/30/24 Mem., ECF No. 100, at 7-11.)

Section 507(b) of the Copyright Act provides that a copyright claim must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b); *accord Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014). "Generally, '[a]n ownership claim accrues only once, when a reasonably diligent plaintiff would have been put on inquiry as to the existence of [his] right [in the work].'" *Horror Inc. v. Miller*, 15 F.4th 232, 257 (2d Cir. 2021) (quoting *Gary Friedrich Enters., LLC v. Marvel Characters*, *Inc.*, 716 F.3d 302, 316 (2d Cir. 2013)). "The accrual rule is slightly different for authorship claims, however: 'Although an alleged author is aware of his claim to ownership of the work from the moment of its creation, the author does not need to bring suit until there has been an express repudiation of that claim.'" *Id*. (quoting *Gary Friedrich Enters., 716 F. 3d at* 317). "In other words, authorship claims 'accrue when plain and express repudiation of [authorship] is communicated to the claimant, and are barred three years from the time of repudiation.'" *Id*. (quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996)); *see also Merchant v. Levy*, 92 F.3d 51, 56 (2d Cir. 1996).

Defendants contend that in "the Spring of 2018," Appel made "several express assertions of sole authorship" and that since that time "Appel always and unequivocally claimed sole authorship of *The Salty Mountain*[.]" (Defs.' 5/30/24 Mem. at 8-11.) However, construing the evidence in the light most favorable to Plaintiff, the nonmoving party, and resolving all

---

[5] "An action to declare a registration invalid arises under the Copyright Act." *D'Arezzo*, 2023 WL 5020344, at *3 n.5 (citing 5 William F. Patry on Copyright § 17:107 (2023)). "In addition, '[c]laims of co-authorship arise directly from the Copyright Act [ ], 17 U.S.C. § 201(a), and are governed by the Act's statute of limitations clause, 17 U.S.C. § 507(b).'" *Id*. (quoting *Dewan v. Blue Man Grp. Ltd. P'ship*, 73 F. Supp. 2d 382, 386 (S.D.N.Y. 1999)).

ambiguities and drawing all inferences in her favor, the Court finds that there are genuine issues of material fact as to whether and when Appel plainly and expressly repudiated Plaintiff's claim of authorship.

First, Defendants point to the April 4, 2018 meeting between D'Arezzo, Appel and Attorney Santangelo, during which Defendants contend that Appel verbally objected to Plaintiff having sole copyright of *The Salty Mountain*. (Defs.' 5/30/24 Mem. at 8; Defs.' 56.1 ¶ 27.) D'Arezzo disputes much of Appel's account of the April 4 meeting. (Pl.'s 56.1 Resp. ¶ 27.) In any event, any objection by Appel to D'Arezzo's purported statement that she wanted the sole copyright is not a plain and express repudiation of D'Arezzo's claim to joint authorship or ownership. To the contrary, the evidence in the record shows that Appel brought a "co-copyright" agreement to the meeting for D'Arezzo to sign but that D'Arezzo did not sign it. (*See* Pl.'s 56.1 Resp. ¶ 27; Appel Dep. Tr. at 190.)

Defendants next point to an April 15, 2018 email Appel sent to D'Arezzo stating, *inter alia*, that "the actual written text, including the sequencing, shaping and flow of the entire narrative with various artistic structures" was entirely hers and that she would not "give up copyright of [her] written material to anyone, or entity other than Overtime Dance Foundation, Inc." (Defs.' 5/30/24 Mem. at 8 (citing Defs.' 56.1 ¶ 29); Ex. Y to Appel Aff. at 3.) This email is part of a series of communications between D'Arezzo and Appel following the April 4, 2028 meeting and D'Arezzo's decision not to sign the joint copyright agreement, which brought to light a dispute between D'Arezzo and Appel about what to do with any profits from the book. Appel writes in response to an email from D'Arezzo the day before suggesting that they "get together as before, as good friends," to figure out how to move forward with the project. (Ex. Y to Appel Aff. at 4.)

Appel's response on April 15, 2018 sets forth her view of the dispute and proposed options. Taken in the light most favorable to Plaintiff, this email does not include a plain and express repudiation of joint authorship, but rather a recognition that both parties needed to agree on what to do with the manuscript.

The next communication cited by Defendants is the April 27, 2018 letter from Appel to D'Arezzo, in which they highlight the following language:

> As the sole author of the book written in close consultation with you, I have a strong interest in protecting the integrity of the manuscript. The way I see it, your legacy with this project is the existence of the stories and your hard work toward having them excavated and accurately preserved through writing. The writing itself does not belong to you and is therefore not your legacy.
>
> . . .
>
> I am not taking anything away from you by acknowledging the true nature of the authorship of *The Salty Mountain*. . . . I now realize that we must each take our rightful place in the story of our creative process and the creation of the book *The Salty Mountain*.

(Ex. Z to Appel Aff., ECF No. 98-6, at 6.) These excerpts, however, were part of a much longer letter that also contained statements disclaiming only D'Arezzo's sole authorship and reaffirming the joint nature of the endeavor. (*See, e.g., id*. at 5 ("It is more prestigious for you to have written with me and to acknowledge our joint accomplishment than it is to pretend otherwise.").)

On May 4, 2028, D'Arezzo sent Appel an email to Appel stating that she agreed that the manuscript could "be considered a joint project" and proposing a joint copyright and a 50/50 share in any proceeds. (Ex. F to Dimon Decl., ECF No. 102-6, at PDF p. 3.) Appel responded the same day, writing in part:

> The literary shaping and telling of these stories in "The Salty Mountain" is an exploration and interpretation of these events in a writing that was entirely created by me.

. . .

And, as I said in my previous letter, more and more, you became the subject of the project. I did not merely structure the phrases. I wrote every word and worked tirelessly with you to get at what, exactly, the stories were and how to write them clearly.

. . .

As a result of this extra time, further investigation and legal consultation on my part, as well as seeing a side of your intentions that had been withheld from me, I now want to adhere fully to the confines of the copyright law, because we did not co-author this book. Yes, it was a collaborative effort, but the actual writing of the work was entirely mine. The only part of the project that can be copyrighted is the text of *The Salty Mountain*, and the text is unmistakably mine. Ideas cannot be copyrighted; and neither can stories. I do not agree to a joint copyright in the book; or that we are co-authors.

(Ex. N to Travis Decl., ECF No. 97-14, at PDF pp. 2-4 (emphasis in original).)

Defendants contend that these statements constitute a plain and express repudiation of D'Arezzo's co-authorship. (Defs.' 5/30/24 Mem. at 9-10.) Although a closer question, the Court cannot conclude that this email constitutes a plain and express repudiation as a matter of law. Defendants quoted language omits other portions of the email that refer to D'Arezzo's role in the project. For example, after stating that she did not agree that they were co-authors, Appel writes "Yes, we did collaborate on a project that I generously allowed you to receive as much credit for as possible. I was and still am happy to do that for you." (Ex. N to Travis Decl. at PDF p. 4.) Moreover, this email was not the end of D'Arezzo's and Appel's communications on the subject. As Appel testified, the May 4, 2018 email was part of a "conversation that [they were] having." (Appel Dep. Tr. at 313.) Thus, there is a genuine issue as to whether this email constituted a plain and express repudiation, given the parties' ongoing communications. *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) (finding genuine issue of fact as to whether claim was barred

by limitations when trier of fact could construe communication "as leaving the question of authorship open for further discussion").

Finally, Defendants point to Appel's May 18, 2018 email to D'Arezzo stating that she had "been advised that, at this time, it [was] preferable for [Appel] to hold the copyright," instead of Overtime Foundation, and that Appel's "authorship [of the book] was so evident that it never occurred to [Appel] that [D'Arezzo] would want [them] to say otherwise." (Ex. P to Travis Decl. at PDF pp. 3-4.) The Court already has found that this email was not a plain and express repudiation of co-authorship. *See D'Arezzo*, 2023 WL 5020344, at *6.

Given the entire record before the Court, including the numerous communications between D'Arezzo and Appel both before and after the correspondence specifically cited by Defendants, the Court finds that there is a genuine dispute as to whether and when there was a plain and express repudiation of joint authorship. *See Gary Friedrich Enterprises*, 716 F.3d at 318 (genuine dispute as to, *inter alia*, when defendant first told plaintiff that it intended to take sole credit for comic book character such that claim was not untimely as matter of law); *Everly v. Everly*, 958 F.3d 442, 455 (6th Cir. 2020) (genuine factual dispute regarding plain and express repudiation of authorship as distinct from voluntary transfer of certain ownership rights); *cf. Brownstein v. Lindsay*, 742 F.3d 55, 72 (3d Cir. 2014) ("For repudiation to be express, it must be plain.").

Notably, during this entire period, Appel and D'Arezzo continued to exchange drafts of *The Salty Mountain* with "By Angela D'Arezzo" on the cover, which also was how the book was eventually published. (*See, e.g.*, Appel Dep. Tr. at 131-33 (discussing April 6, 2018 draft); *see also* Appel Aff. ¶ 24 ("The published book states on the cover 'Angela D'Arezzo with Cathy Appel[,]' a

phrasing that traditionally denotes the first name as the author and the second name as a helper.").) Appel had, at one point, explained this language to D'Arezzo as indicating that D'Arezzo was the author with Appel's assistance. (*See* D'Arezzo Aff. ¶ 15; Dimon Decl. Ex. D, ECF No. 102-4 (text messages between Appel and D'Arezzo).) This continuing attribution to D'Arezzo undermines Defendants' contention that other communications by Appel expressly and plainly repudiated D'Arezzo's authorial rights. *See Horror*, 15 F.4th at 258 (noting that "the language 'A Screenplay by Victor Miller,'" which appeared on a draft of the screenplay, "appear[ed] to attribute authorship" to Miller, undermining the contention that a copyright ownership notice on the cover page "expressly and plainly repudiated Miller's authorial rights"); *cf. Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013, 1016-17 (10th Cir. 2013) ("Awareness that one is not being credited in the same manner as other authors starts the statute of limitations running for copyright co-ownership claims.").

For these reasons, the Court cannot conclude as a matter of law that Plaintiff's claim is barred by the statute of limitations.[6] Accordingly, Defendants' motion with respect to Claim II is denied.

---

[6] Because the Court declines to grant summary judgment to Defendants on limitations grounds based upon the existence of genuine issues of material fact as to whether and when Appel plainly and expressly repudiated Plaintiff's claim of joint authorship, the Court does not reach the issues of whether the limitations period should be equitably tolled and/or whether Defendants should be equitably estopped from asserting a statute of limitations defense. (*See* Pl.'s 7/12/24 Opp. Mem. at 15-17; Defs.' 8/21/24 Reply at 9-10.) The Court will decide whether or not to submit these issues to the jury after the close of the evidence at trial. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("A litigant is entitled to [a jury] instruction on a claim where that claim is supported by evidence of probative value.").

## II.    <u>Breach Of Fiduciary Duty Claim (Claim IV)</u>

Defendants argue for summary judgment on Plaintiff's breach of fiduciary duty claim on the ground that no fiduciary relationship existed between Appel and D'Arezzo. (Defs.' 5/30/24 Mem. at 3-7.) In opposition to Defendants' motion for summary judgment, D'Arezzo argues that "[t]here is ample evidence showing that D'Arezzo reposed a high degree of trust and confidence in Appel both as a close and trusted friend and as someone with superior knowledge and expertise of the publishing industry."[7] (Pl.'s 7/12/24 Opp. Mem. at 6-7, *see also id*. at 8-9.)

"To state a breach of fiduciary duty claim under New York law, a plaintiff must plead: (i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom."[8] *Spinelli v. Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018) (internal quotation marks and citation omitted). "A well-established definition of a fiduciary relationship under New York law is a relationship where 'confidence is reposed on one side and there is resulting superiority and influence on the other.'" *Uddo v. DeLuca*, 837 F. App'x 39, 42 (2d Cir. 2020) (quoting *Roni LLC v. Arfa*, 18 N.Y.3d 846, 848 (2011)); *see also EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 19 (2005) ("A fiduciary relationship exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.")). "The rule embraces both technical fiduciary relations and those informal

---

[7] Defendants argued in their original motion that Plaintiff's breach of fiduciary claim could not be based on any alleged patient-therapist relationship between D'Arezzo and Appel because Appel was not D'Arezzo's therapist. (Defs.' 5/30/24 Mem. at 4.) D'Arezzo does not dispute this argument in responding to Defendants' motion (s*ee* Pl.'s 7/12/24 Opp. Mem. at 6-11) and, indeed, evidence in the record shows that Appel was not D'Arezzo's therapist. (*See* ECF No. 97-15 (email from D'Arezzo to Gabriella Gafni referring to Appel's "best friend who was my psychotherapist at the same Center where Cathy worked.").)

[8] The parties agree that New York law governs Plaintiff's common law claims. (*See* Defs.' 5/30/24 Mem. at 3-4, 12 (relying upon New York law); Pl.'s 7/12/24 Opp. Mem. at 7-9 (relying upon New York law).)

relations which exist whenever one man trusts in, and relies upon, another." *Penato v. George*, 52 A.D.2d 939, 942 (2d Dep't 1976). "Such a relationship might be found to exist, in appropriate circumstances, between close friends . . . or even where confidence is based upon prior business dealings." *Id*. (citations omitted); *see also AHA Sales, Inc. v. Creative Bath Prod., Inc*., 58 A.D.3d 6, 21-22 (2d Dep't 2008).

Determining whether a fiduciary relationship exists is a "necessarily fact-specific" inquiry. *EBC I*, 5 N.Y.3d at 19; *see also Dresses For Less, Inc. v. CIT Group/Commercial Servs., Inc*., No. 01-CV-02669 (WHP), 2002 WL 31164482, at *16 (S.D.N.Y. Sept.30, 2002) ("The existence of a fiduciary duty is often 'a fact-specific inquiry reserved for a jury.'") (citation omitted); *Nuss v. Sabad*, 976 F. Supp. 2d 231, 248 (N.D.N.Y. 2013) ("Whether a fiduciary relationship exists is a question of fact, and conflicting evidence as to its existence will preclude a motion for summary judgment.").

There is no dispute that D'Arezzo and Appel have known each other for at least 25 years and worked closely together on *The Salty Mountain* for well over a decade. (D'Arezzo Aff. ¶¶ 3,7; Appel Aff. ¶¶ 6, 8, 18, 21.) Moreover, there is evidence in the record from which a reasonable factfinder could conclude that D'Arezzo trusted Appel and relied upon her advice in matters relating to *The Salty Mountain*. Communications between Appel and D'Arezzo, read in the light most favorable to D'Arezzo, support D'Arezzo's assertion that she "relied upon and deferred to Appel's expertise throughout their collaborative work on *The Salty Mountain*, particularly as Appel made D'Arezzo feel that the path to publishing her book was through Appel." (Pl.'s 56.1

Resp. ¶ 47[9] (citing D'Arezzo Aff. ¶¶ 8, 12); *see also* D'Arezzo Aff. ¶¶ 15-16, 18, 21-30; Ex. Z to Appel Aff., ECF No. 98-6, at 4 (April 27, 2018 letter from Appel to D'Arezzo noting that D'Arezzo "went along with everything [Appel] was telling [her], asking [her] and explaining").)

The Court finds that evidence of a longstanding, close relationship between D'Arezzo and Appel, along with evidence that D'Arezzo relied upon Appel's advice in matters relating to *The Salty Mountain*, is sufficient to raise a genuine issue of fact as to whether or not D'Arezzo and Appel had a fiduciary relationship. Accordingly, Defendants' motion for summary judgment dismissing the breach of fiduciary duty claim is denied. *See Holland v. Fahnestock & Co.*, No. 01-CV-02462 (RMB) (AJP), 2003 WL 21697880, at *7 (S.D.N.Y. July 21, 2003) (denying summary judgment where "[g]enuine issue[] of material fact remain[ed] with regard to . . . whether Defendants owed a fiduciary duty to the Plaintiffs").

## III.    Accounting Claim (Claim V)

In Claim V, D'Arezzo alleges that, "[t]o the extent it is determined that D'Arezzo and Appel are co-authors of The Salty Mountain, Appel owes a duty to account to D'Arezzo for all income and proceeds generated from the use, sale, production, reproduction, or exploitation of that work." (FAC ¶ 70.) As Defendants assert (*see* Defs.' 5/30/24 Mem. at 11), Plaintiff's accounting claim is preempted by the Copyright Act. *See McKenzie-Morris v. V.P. Recs. Retail Outlet, Inc.*, No. 22-CV-01138 (GHW), 2023 WL 5211054, at *10 (S.D.N.Y. Aug. 13, 2023), *reconsideration denied*, 2023 WL 6603605 (S.D.N.Y. Oct. 7, 2023) ("[A]s numerous courts in this district have found, 'claims for accounting based on the defendant's alleged misappropriation and exploitation of a

---

[9] This paragraph is from Plaintiff's Additional Material Facts to which Defendants did not separately respond.

copyright work are preempted by the Copyright Act.'" (citation omitted)). Thus, Defendants' motion for summary judgment dismissing Claim V is granted.

## IV.    Constructive Trust (Claim VI)

In Claim VI, D'Arezzo alleges that, "[i]n breach of fiduciary duties owed to D'Arezzo, Appel diverted monies and property that were due to D'Arezzo," and that "[a] constructive trust should be imposed on the amounts received by Appel and/or Overtime Dance Foundation from or relating to The Salty Mountain." (FAC ¶¶ 75, 79.) "Under New York law, a party seeking a constructive trust must establish four elements: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." *Faulkner v. Arista Recs. LLC*, 602 F. Supp. 2d 470, 484 (S.D.N.Y. 2009).

The sole basis upon which Defendants seek to dismiss Plaintiff's constructive trust claim is Defendants' argument that Defendants should be granted summary judgment dismissing Plaintiff's breach of fiduciary duty claim. As set forth above, the Court has found that there are genuine issues of material fact that preclude summary judgment on Plaintiff's breach of fiduciary duty claim. Thus, Defendants' motion for summary judgment dismissing Plaintiff's constructive trust claim is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendants' motion is granted with respect to Plaintiff's accounting claim (Claim V) and denied with respect to Plaintiff's remaining claims (Claims II, IV and VI). Thus,

the case shall proceed to a jury trial on Claims II, IV and VI. No later than November 1, 2024, the

parties shall file a proposed Joint Pretrial Order, pursuant to the Court's Individual Practices.

Dated:         New York, New York
               October 3, 2024

_____

**STEWART D. AARON**
**United States Magistrate Judge**